773 A.2d 1231

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Antoine LIGONS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 2, 2001.

Decided July 6, 2001.

Nigro, J., concurred in result.

418

Michael E. Wallace, Philadelphia, for appellant, Antoine Ligons.

Catherine Lynn Marshall, Helen T. Kane, Philadelphia, Robert A. Graci, Harrisburg, for appellee, Com. of PA.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

SAYLOR, Justice.

Appellant, Antoine Ligons ("Ligons"), appeals from a sentence of death imposed for the first-degree murder and robbery of Clarence Johnson, a pizza deliveryman.

On the evening of April 6, 1996, Ligons and his girlfriend, Irene Williams, were sitting on the porch of her home at 320 North Horton Street in West Philadelphia. Also present were Cecil Jackson and his brother Edward. Cecil Jackson was a childhood friend of Ligons and the boyfriend of his mother, who lived next door at 322 North Horton Street. The Jackson brothers routinely teased Ligons and were doing so on this occasion. Ligons ultimately left the porch, later telephoning Ms. Williams to advise her that he was going to do something and that he might not return. Ms. Williams observed Ligons

leaving his grandmother's home at 312 North Horton Street and noticed that he was dressed entirely in black.[1]

At approximately 10:45 p.m., an employee of Stavros Pizza, at 52nd and Market Streets in Philadelphia, received a telephone order, to be delivered at 250 Robinson Street, which is located one block behind the address where Ligons resided. The caller did not provide a telephone number, stating that he was calling from a neighbor's home. Shortly thereafter, the caller telephoned again, placing a second order for drinks to be delivered at the same address. At approximately 11:30, Clarence Johnson was given the order for delivery, along with $10.00 with which to make change. Mr. Johnson's wife, Sonja, accompanied him.

Arriving at the North Robinson Street address, Mr. Johnson parked in the middle of the street, while his wife waited in the car. As Mr. Johnson began to climb the steps leading to the porch for the residence, Ligons, who was dressed in black and wearing a ski mask, emerged from an adjacent alley, approached Mr. Johnson from behind, and pushed him onto the porch and against a wall. Holding a gun to Mr. Johnson's head, Ligons stated, "you know what this is." When Mrs. Johnson opened the car door, Ligons threatened to kill her husband if she moved. Ligons demanded Mr. Johnson's money and then pushed him off the porch and into the alley. Mrs. Johnson was able to observe the incident, as she was approximately seven to ten feet from Ligons, and the alley was illuminated by streetlights. In addition, although Ligons was wearing a ski mask, the area around his eyes was exposed, allowing Mrs. Johnson to discern certain of his facial features. Mr. Johnson handed over his money, and Ligons began checking his pockets for any additional money. Ligons turned to Mrs. Johnson and asked whether she had any money, to which she responded that her husband had given Ligons everything. Ligons then taunted Mr. Johnson, repeatedly asking him whether he wanted to live, with Johnson pleading for his life.

1. Ligons was living at the home of his grandmother, who had been hospitalized.

Ligons responded by shooting Mr. Johnson in the back of the head and fleeing down the alley toward North Horton Street.

Residents at the scene called the police, and, within minutes of the shooting, an officer arrived, finding Mr. Johnson in the alley and lying in a pool of blood. Mrs. Johnson described the perpetrator to police as an African American male with a light complexion, hazel colored eyes, approximately five feet eight inches in height, weighing 150–165 pounds, and wearing a ski mask, black Timberland boots, and black clothing. Mr. Johnson was taken to a hospital, where he was pronounced dead; an autopsy confirmed the cause of death as a single gunshot to the back of his head. Forensic analysis of Mr. Johnson's clothing, in particular, a bandana, indicated that the gun was fired within six to twelve inches of his head. At the scene, police recovered a 9mm casing and a bullet that was consistent with either a .38 caliber or 9mm firearm. In addition, police received an anonymous tip that the perpetrator was located at the residence of either 312 or 322 North Horton Street. Officers knocked on the door of the home, but no one responded.

Following the shooting, Ligons telephoned Ms. Williams, asking her to call a taxicab for him, stating that he thought that he had killed someone, and explaining that the victim had pulled a gun on him. In subsequent conversations with Ms. Williams, Ligons threatened her, on one occasion declaring, "I took a life and don't you think that I won't kill again." As a result, Ms. Williams and her mother left the area to stay with relatives in Salisbury, Maryland. Upon learning of Ms. Williams' departure, Ligons telephoned the residence of her cousin, Keith Wright, in an attempt to speak with Ms. Williams.[2] In his conversations with Mr. Wright, Ligons admitted to having killed someone to obtain money to impress Ms. Williams and acknowledged that a woman was present during the crime, but that he was not concerned because he had been wearing a mask.

2. Ligons knew Mr. Wright from having lived in Maryland with Ms. Williams.

Mr. Wright contacted the police, and on April 10, 1998, two detectives traveled to Salisbury, Maryland to interview him and Ms. Williams. Ms. Williams told the detectives of her telephone conversation with Ligons on the night of the murder and of her observations of him shortly thereafter. In addition, Ms. Williams said that, a day or two before the murder, she had overheard Edward Jackson mention that he had a gun, and, on the night of the murder, she had seen Mr. Jackson leave 322 North Horton Street carrying what appeared to be an object wrapped in a jacket, which he then took to Ligons' house at 312 North Horton Street. Based upon the information supplied by Mr. Wright and Ms. Williams, the police obtained an arrest warrant for Ligons and search warrants for both 312 and 322 North Horton Street.

Ligons was arrested at 312 North Horton Street; in his pocket the police found a matchbook with the number for Stavros Pizza written on the inside cover. In addition, police recovered a pair of black boots from the basement of the residence. During the search of 322 North Horton Street, the police recovered menus from Stavros Pizza in the living room of the home. Ligons was charged with murder, robbery, and possession of an instrument of crime.

Following his arrest, the police questioned Ligons regarding the crime. Ligons admitted his involvement, stating that he and Ms. Williams had argued and that she was planning to return to Maryland, and he thought that if he could give her some money she would stay. In addition, Ligons said that his grandmother had been hospitalized, that there were a number of bills, and that he did not want her to lose her home. As a result, he decided to call for a pizza and rob the deliveryman, choosing Stavros because he had a menu from that establishment. Ligons indicated that Cecil Jackson had placed the order, and that Edward Jackson had supplied the gun. Furthermore, Ligons' description of the clothing he wore during the crime was consistent with that described by Mrs. Johnson. Concerning the robbery, Ligons said that he waited for the pizza delivery, and when Mr. Johnson arrived, Ligons explained that he jumped out and announced that it was a

robbery. However, Ligons claimed that Johnson had threatened him and brandished a gun. In response, Ligons stated that he pointed his gun toward Mr. Johnson's head and that the next thing he knew it discharged. Ligons denied having taken anything from Johnson.

Prior to trial, the Commonwealth notified Ligons of its intention to seek the death penalty, asserting as an aggravating circumstance the occurrence of the murder during the perpetration of a felony, see 42 Pa.C.S. § 9711(d)(6), namely, robbery. At trial, the Commonwealth presented testimony from the investigating police officers and detectives concerning the crime scene and Ligons' statement. Testimony was also presented from Ms. Williams and Mr. Wright. In the case of Ms. Williams, however, she recanted portions of her statement to the police. The Commonwealth therefore introduced her prior statement through the detective who interviewed her. In addition, the Commonwealth presented expert testimony regarding the cause of death, the approximate distance at which the shooting occurred, and the type of weapon used in committing the crime.

Mrs. Johnson also testified, describing her observations at the time of the crime and indicating that she had identified Ligons from a photographic array. Defense counsel objected to the testimony concerning the photographic identification, as the Commonwealth had not disclosed such evidence during discovery. The Commonwealth responded by asserting that Mrs. Johnson's testimony was unexpected and that she must be mistaken. The trial court sustained the objection and instructed the jury to disregard such evidence. On cross-examination of Mrs. Johnson, however, defense counsel elicited additional testimony respecting the alleged photographic identification. The Commonwealth responded by introducing rebuttal testimony from the investigating detectives, who asserted that a photographic identification was not conducted. The defense did not present any witnesses, and Ligons elected not to testify. In his summation, defense counsel argued that the inconsistency between Mrs. Johnson's testimony and that of the detectives bore upon her credibility. In her argument,

the prosecutor suggested that the jurors disregard the identification testimony of Mrs. Johnson, and the trial court instructed the jury that they must consider her identification testimony with caution. The jury found Ligons guilty of first-degree murder, robbery, and possession of an instrument of crime, and the case proceeded to a sentencing hearing.

During that hearing, the Commonwealth incorporated the record from the guilt phase of the trial in support of the alleged aggravating circumstance, namely, that the murder occurred during the commission of a robbery. As mitigating circumstances, Ligons offered his lack of a significant history of prior criminal convictions, his youth at the time of the crime, and the catchall circumstance. *See* 42 Pa.C.S. § 9711(e)(1), (4), (8). In support, Ligons presented testimony from Ms. Williams, who had a child with him and described him as a good father. Ligons also offered testimony from his mother, who stated that he grew up without a father and had difficulty adjusting to her relationship with Cecil Jackson. Ligons' grandmother testified, however, that his mother did not love him, characterizing their relationship as strained. Ligons' grandmother also testified that he was a good person and helped her around the house. Finally, Allen Tepper, Ph.D., a psychologist, opined that Ligons had difficulty adjusting to his mother's relationship with Cecil Jackson, and that Ligons felt abandoned. Dr. Tepper noted that there were also reports of Ligons having been physically abused by his mother. In her closing remarks, the prosecutor noted that the jurors did not hear testimony concerning Mr. Johnson, who could no longer be with his family and who had been only 31 years old and attempting to earn a living. In addition, the prosecutor explained that, in weighing the aggravating and mitigating circumstances, the Commonwealth must prove the aggravator beyond a reasonable doubt, while the defense need only "tip the scale a little bit." The prosecutor thus characterized the death penalty statute as emphasizing the imposition of a life sentence. The trial court, however, instructed the jury regarding the respective burdens associated with the aggravating and mitigating circumstances, noting that such

procedure acts as a safeguard against the imposition of unjust death sentences. The jury returned with a verdict of death, finding the aggravating circumstance submitted by the Commonwealth and no mitigating circumstances.

On appeal, Ligons claims that the Commonwealth failed to disclose evidence of a photographic identification by Mrs. Johnson, and that when she testified to such identification, the trial court should have granted a mistrial or, in the alternative, stricken the testimony at issue and instructed the jury to disregard it. Ligons further contends that he is entitled to a new penalty hearing as a result of the prosecutor's arguments inviting the jury to consider victim impact evidence and characterizing the death penalty statute as geared in favor of imposing a life sentence.

Although not raised as an issue by Ligons, in all cases in which the death penalty has been imposed, we review the sufficiency of the evidence. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982). To establish murder in the first degree, the Commonwealth must prove, *inter alia,* that the defendant specifically intended to kill, which fact is established by proof of premeditation and deliberation. *See Commonwealth v. Weinstein,* 499 Pa. 106, 115, 451 A.2d 1344, 1348 (1982). Here, the Commonwealth's proof consisted of Ligons' admissions to Mr. Wright and the police, eyewitness testimony, and circumstantial and forensic evidence. Such proof indicated that Ligons planned a robbery, waited in an alley,[3] robbed and then shot Mr. Johnson in the back of the head at close range after repeatedly asking him whether he wanted to live. Such evidence provided an ample foundation for the jury to conclude that Ligons was the perpetrator, and that he acted with the specific intent to kill.

In his sole guilt-phase claim, Ligons maintains that he is entitled to a new trial because the Commonwealth failed to disclose during discovery certain evidence, specifically, Mrs. Johnson's photographic identification. Ligons argues that he

---

3. The definition of an "intentional killing" includes killing by means of lying in wait. *See* 18 Pa.C.S. § 2502.

suffered prejudice from this omission, since his defense was premised upon mistaken identification, which was weakened by Mrs. Johnson's testimony of having previously identified Ligons from a photographic array. In response, the Commonwealth contends that it was unaware of the identification evidence and did not possess it at the time of trial. In addition, the Commonwealth notes that the trial court sustained defense counsel's objection to Mrs. Johnson's reference on direct examination to the photographic identification and instructed the jury to disregard such evidence, and that defense counsel elicited the details of the purported photographic identification during cross-examination. According to the Commonwealth, therefore, Ligons is not entitled to relief.

Concerning the alleged discovery violation, Rule of Criminal Procedure 305 provides, in pertinent part:

**(B) Disclosure by the Commonwealth.**

(1) Mandatory. In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

\* \* \*

(d) The circumstances and results of any identification of the defendant by voice, photograph, or in person identification.

\* \* \*

**(E) Remedy.** If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the

defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 305(B)(1)(d), (E). Pre-trial disclosure of identification evidence permits a defendant to determine whether there is a basis for challenging the admission of such evidence. *See generally* Pa.R.Crim.P. 305 cmt. Although the failure to comply with this directive may warrant a new trial, *see Commonwealth v. Floyd,* 508 Pa. 393, 397, 498 A.2d 816, 818 (1985) (plurality opinion), the trial court is accorded broad discretion in fashioning a remedy, with a mistrial warranted only when the violation is of such nature as to deprive the defendant of a fair trial. *See Commonwealth v. Counterman,* 553 Pa. 370, 398, 719 A.2d 284, 298 (1998). Thus, a defendant seeking relief from a discovery violation must demonstrate prejudice. *See Commonwealth v. Jones,* 542 Pa. 464, 507, 668 A.2d 491, 512 (1995).

In this case, however, it is unclear whether any identification evidence existed in the first instance. While Mrs. Johnson testified to having identified Ligons from a photographic array, the detectives assigned to the case maintained that such identification did not occur. Significantly, the trial court did not decide whether a photographic identification occurred, and without such a finding, this Court cannot conclude that the evidence existed. *See generally Commonwealth v. Byrd,* 493 Pa. 178, 183, 425 A.2d 722, 724 (1981) (explaining that factual disputes are not resolved by the appellate courts). Consequently, this is not a case in which discoverable evidence clearly existed, but was in the possession of someone other than the attorney for the Commonwealth. *Cf. Commonwealth v. Bonacurso,* 500 Pa. 247, 251 n. 3, 455 A.2d 1175, 1177 n. 3 (1983).[4]

---

4. Of additional significance, Ligons does not frame his claim as implicating the prosecutor's duty to disclose exculpatory evidence pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), nor does it appear that such argument could be made, since the purported evidence is not characterized as exculpatory. *See generally Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995) (explaining that a "prosecutor has a duty to learn of favorable evidence known to others acting on the government's behalf, including the police").

Nevertheless, although the trial court did not resolve the factual issue, defense counsel's objection was sustained, and the jury was initially instructed to disregard such testimony. Despite the ruling, defense counsel cross-examined Mrs. Johnson on the circumstances surrounding the purported photographic identification, later arguing to the jury that her testimony was incredible given the conflicting testimony of the detectives, who maintained that such identification did not occur. Moreover, in her closing argument, the prosecutor asked the jurors to disregard Mrs. Johnson's identification testimony, and the trial court instructed the jury to consider her identification testimony with caution.[5] In light of such circumstances, therefore, we conclude that Ligons was not deprived of a fair trial and the trial court did not err in declining to grant a mistrial.

Ligons next claims that the prosecutor's closing argument in the penalty phase improperly interjected victim impact evidence into the case, when such evidence had not been presented during the penalty hearing. Victim impact evidence is described in Section 9711(a)(2) of the Sentencing Code as "information concerning the victim and the impact that the death of the victim has had on the family of the victim."[6] In this regard, the prosecutor stated:

> What you heard today revolved around one person, the defendant. You heard nothing about Clarence Johnson today but you must remember that this case really is about Clarence Johnson and the fact that he did not have opportu-

---

5. The trial court's general identification instruction informed the jury that an eyewitness's identification should be viewed with caution where he or she did not have an opportunity to clearly view the perpetrator, equivocated in identifying the defendant, or had difficulty making an identification in the past. See Commonwealth v. Kloiber, 378 Pa. 412, 424, 106 A.2d 820, 826–27 (1954); see also Pa. SSJI (Crim) 4.07. The trial court advised the jury that, since Mrs. Johnson did not see the perpetrator clearly (apparently due to his mask), the requirement to consider her identification testimony with caution was mandatory.

6. 42 Pa.C.S. § 9711(a)(2) (effective December 10, 1995). Without any development, Ligons maintains that Section 9711(a)(2) is unconstitutional. However, the constitutionality of this section was recently upheld by this Court in Commonwealth v. Means, —— Pa. ——, 773 A.2d 143, 2001 WL 708446 (2001).

nities to be with his family, to be with his children, to be with his wife, mother, brothers, sister, after this incident. He was only 31 years old. He was trying to make a living. He was trying to earn whatever you could earn as a pizza deliveryman. The defendant didn't take the effort, didn't make the effort to do that himself, to help support his family. He let his grandmother support his girlfriend and his child for him, not because he was lacking in intelligence or even lacking in ability to work and earn money.

The Commonwealth argues that the above remarks were merely a response to the mitigating circumstances offered on behalf of Ligons and, as such, within the bounds of permissible argument.

In general, closing remarks are evaluated within the context in which they were made, and a prosecutor's argument will not warrant relief "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *See Commonwealth v. Morales,* 549 Pa. 400, 423, 701 A.2d 516, 527–28 (1997). Moreover, while a closing argument must be based upon evidence in the record or reasonable inferences therefrom, *see Commonwealth v. Colson,* 507 Pa. 440, 466, 490 A.2d 811, 824 (1985), a prosecutor is permitted to respond to defense evidence and engage in oratorical flair. *See Commonwealth v. Basemore,* 525 Pa. 512, 528–29, 582 A.2d 861, 869 (1990). Indeed, greater latitude in presenting argument is afforded during a penalty phase, as the presumption of innocence is no longer applicable. *See Commonwealth v. Travaglia,* 541 Pa. 108, 134, 661 A.2d 352, 365 (1995).

Here, although the prosecutor's argument did not constitute victim impact evidence, as the arguments of counsel are not evidence, *see Commonwealth v. LaCava,* 542 Pa. 160, 182, 666 A.2d 221, 231 (1995), the commentary touched upon the circumstances of the victim and his family. Ligons, however, offered, as mitigating circumstances, evidence that he

was a good father, helped care for his grandmother, endured a troubled and difficult childhood, and had been unloved and abandoned by his mother. The prosecutor's remarks were offered to counter the sympathy associated with Ligons' mitigating evidence by contrasting his circumstances with those of the victim. *Cf. Commonwealth v. Jones,* 546 Pa. 161, 206–07, 683 A.2d 1181, 1203 (1996) (reasoning that the prosecutor's statement as to what the victims' families might have said had they testified regarding the defense requests for sympathy and leniency constituted permissible rebuttal of defense mitigation evidence). Given such context, we decline to conclude that the remarks so prejudiced the jury that it could not weigh the evidence objectively and render a true verdict. *See generally Commonwealth v. Fisher,* 559 Pa. 558, 576, 741 A.2d 1234, 1243 (2000) (concluding that the prosecutor's isolated reference to the victim's family did not unfairly prejudice the jury).

Ligons' remaining claim also concerns the prosecutor's closing argument, in particular, the following:

You, ladies and gentlemen, by your penalty verdict, will determine whether the defendant should be sentenced to life imprisonment or to death. Our statute is geared so that it gears in and emphasizes not giving a death penalty, that's why when the judge explained to you the different weighing, that the Commonwealth must prove it beyond a reasonable doubt while the defense only has to tip the scale a little bit, that is because our law is geared not to give death penalties.

Ligons contends that such argument diverted the jury's attention from the evidence and constituted an invitation to the jury to right a wrong that is embodied in the death penalty statute. The Commonwealth asserts that the prosecutor was simply explaining the practical effect of the statutory scheme in light of the respective burdens of proof.

While the prosecutor's description of the death penalty statute may not have been ideal, the commentary did not seek to circumvent the judicial process by interjecting considerations outside the sentencing statute. *Cf. Morales,* 549 Pa. at 425, 701 A.2d at 528 (determining that the prosecutor's argument for the death penalty based upon the implication

that liberal judges may release the defendant from a life sentence improperly invoked a consideration outside the death penalty statute). Moreover, any potential prejudice occurring by virtue of such description was ameliorated by the trial court's instructions, which elaborated upon the sentencing scheme, explaining that the different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences, and that the defendant receives the full benefit of any mitigating circumstances. *See Commonwealth v. Spotz*, 563 Pa. 269, 286–87, 759 A.2d 1280, 1290 (2000) (endorsing a similar instruction).

Having concluded that Ligons' claims are without merit, we are required to affirm the judgment of sentence unless we determine that:

(i) the sentence of death was a product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in Subsection (d).

42 Pa.C.S. § 9711(h)(3).

After reviewing the record, we conclude that the sentence of death imposed in this case was not the product of passion, prejudice, or any other factor, but rather, was based upon evidence that Ligons specifically intended to kill Johnson during the perpetration of a felony, robbery. *See* 42 Pa.C.S. 9711(d)(6).

Accordingly, we affirm the verdict and sentence.[7]

Justice NIGRO concurs in the result.

---

[7.] Pursuant to Section 9711(i) of the Judicial Code, 42 Pa.C.S. § 9711(i), the Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania within 90 days.