J-A26027-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MARQUIS THOMAS | : | |
| | : | |
| Appellant | : | No. 17 EDA 2022 |

Appeal from the Judgment of Sentence Entered October 28, 2021
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0004273-2019

BEFORE:   BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:                    **FILED FEBRUARY 21, 2023**

Appellant, Marquis Thomas, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas, following his jury trial convictions for first-degree murder, two counts of aggravated assault on a child less than 13 years old, two counts of simple assault, two counts of endangering the welfare of a child, and strangulation.[1]  We affirm.

In its opinion, the trial court summarized the relevant facts of this case as follows:

> Appellant's convictions arose out of the October, 2016 death of his girlfriend's, Pailenn Bunrout's, four-year-old daughter, K.B.  In addition, his convictions arose out of the abuse of his girlfriend's then 10-year-old son, D.B. in 2018.  In 2019,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a); 2702(a)(9); 2701(a)(1); 4304(a)(1); and 2718(a)(1), respectively.

D.B. disclosed that Appellant had choked him, and had done so several times, and had engaged in other abusive behaviors. At the time of the respective crimes, Appellant was living with his girlfriend, her children, K.B. and D.B., and a child they shared together, K.T. K.B. and D.B. thought of Appellant as their father. [Although the cause of K.B.'s death was initially ruled "undetermined," after D.B. sustained injuries in 2018 similar to injuries K.B. had presented with shortly before her death in 2016, police began to reinvestigate the circumstances of K.B.'s death].

At trial, the defense asserted that K.B.'s cause of death was undetermined as reported by the Montgomery County Coroner's Office in its autopsy report, and the constellation of injuries that were found on her both externally and internally were likely caused by strenuous and improper resuscitation efforts as suggested by the autopsy report. In defense of the abuse to D.B., it was asserted that D.B.'s February 9, 2019 disclosure and his trial testimony were not credible.

(Trial Court Opinion, filed February 16, 2022, at 1-2).[2]

On October 28, 2021, a jury convicted Appellant of the above-mentioned offenses. Appellant proceeded immediately to sentencing, at which time the court sentenced Appellant to life imprisonment for the murder conviction and imposed lesser sentences for some of the other offenses. On Monday, November 8, 2021, Appellant timely filed post-sentence motions, which the court denied the next day. Appellant timely filed a notice of appeal on December 9, 2021. On December 16, 2021, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied on January 6, 2022.

_____

[2] For a more detailed recitation of the facts of this case, *see id.* at 2-27.

Appellant raises eight issues for our review:

1) Did the trial court err in denying Appellant's post-sentence motion for a judgment of acquittal as to murder of the first degree in that:

    A.    The Commonwealth failed to present evidence that Appellant acted with the specific intent to kill; and

    B.    The Commonwealth failed to demonstrate that the decedent was in the sole care and custody of Appellant?

2) Did the trial court err in denying Appellant's post-sentence motion for a new trial as the verdict was against the weight of the evidence where the Commonwealth's case was riddled with inconsistencies and defied common sense as to the nature and extent of the injuries allegedly sustained by the two children?

3) Did the trial court err in denying Appellant an opportunity to proceed to a hearing challenging the competency of a child witness for taint?

4) Did the trial court err in admitting child hearsay pursuant to the tender years exception?

5) Did the trial court err in denying Appellant's motion for a mistrial for a discovery violation where the child complaining witness disclosed additional facts to the Commonwealth during trial preparations and the Commonwealth failed to disclose this new information to Appellant prior to that witness's testimony?

6) Did the trial court err in denying Appellant's motion for a continuance where a pediatric pathologist became unavailable to testify?

7) Did the trial court err in admitting autopsy photographs of the four-year-old decedent?

8) Did the trial court err in declining to read the proposed *voir dire* questions to the jury panel regarding the nature of the offenses and the autopsy photographs of the four-year-

old decedent to determine if potential jurors could set aside their passions and determine the matter based on the evidence presented?

(Appellant's Brief at 6-7).

After a thorough review of the record, the briefs of the parties, and the relevant law, we agree with the trial court's thorough legal analysis as set forth in the trial court's opinion. (*See* Trial Court Opinion at 29-64). Therefore, we adopt the trial court's reasoning as our own.

Specifically, the trial court evaluated each of Appellant's issues on appeal as follows. With respect to Appellant's challenge to the sufficiency of the evidence, the Commonwealth's forensic pathology expert, Dr. Gulino, opined that K.B. died from blunt impact trauma associated with strangulation, and the manner of death was homicide. Dr. Gulino expressly rejected the defense theory that K.B.'s injuries were a result of Appellant's efforts at CPR. Additionally, the Commonwealth's pediatric child abuse expert, Dr. Christian, opined that K.B. was severely beaten and that she died of trauma. Dr. Christian categorically denied that K.B.'s injuries could have been caused by CPR. In sum, the Commonwealth presented sufficient evidence that Appellant possessed the intent to kill by using deadly force on K.B. Further, the evidence established that Appellant and the children were the only people in the home when K.B. suffered the fatal injuries. Thus, the jury properly concluded that K.B. was in the sole and exclusive custody of Appellant when she died, such that the "sole and exclusive custody" inference of guilt applied. (*See id.* at

- 4 -

29-36).

Regarding Appellant's challenge to the weight of the evidence, the court rejected Appellant's claim that the testimony was "riddled with inconsistencies and defied common sense as to the nature and extent of the injuries allegedly sustained by the two children." Rather, the testimony of Dr. Christian and Dr. Gulino was credible and credited by the jury. The jury was free to credit the testimony of the Commonwealth's experts and to reject the testimony of Dr. Hamel, who had performed the autopsy on K.B. and opined that the injuries could have been caused by CPR. Additionally, D.B.'s disclosures regarding the abuse he sustained by Appellant were consistent with his injuries. (*Id.*at 36-39).

Concerning Appellant's claim that the court erred in denying him a competency hearing for D.B., Appellant bore the burden of establishing "some evidence" of taint to warrant a hearing. Here, D.B. made his disclosure regarding abuse to a Department of Human Services ("DHS") caseworker while he was living at his maternal grandmother's home and was no longer living with Appellant, which helped explain D.B.'s belated disclosure. The fact that Appellant was seeking sole custody of another child he shared with Ms. Bunrout did not, on its own, support a hostile motive on Ms. Bunrout's part to coach D.B. Under the circumstances, Appellant did not satisfy his burden to warrant a taint hearing. (*Id.* at 39-42).

With respect to Appellant's challenge to application of the Tender Years

exception to the hearsay rule, although D.B. provided differing statements in 2018 and 2019, this is attributable to a change in his circumstances, as D.B. was no longer living with Appellant when he disclosed the abuse. D.B.'s 2019 disclosure to his mother was consistent with his 2019 disclosure to a forensic interviewer. D.B. had no motive to fabricate an abuse allegation against Appellant, who D.B. considered his father. The court listened to the credible testimony of Ms. Bunrout, the DHS caseworker to whom D.B. disclosed, and D.B.'s *in camera* testimony. Ultimately, the court decided the content and circumstances of D.B.'s statements provided a sufficient indicia of reliability to satisfy the Tender Years exception. (*Id.* at 42-48).

Regarding Appellant's claim that the court should have declared a mistrial, Appellant complains that D.B. disclosed an additional fact during his trial testimony—stating that he had "passed out" from Appellant's prior abuse—that was not previously shared with Appellant. Nevertheless, any discovery violation here did not impact Appellant's cross-examination of the Commonwealth's expert, Dr. Christian, concerning the mechanics of strangulation. Further, the testimony of passing out was within the context of what was being described in all materials previously provided to the defense, even though the exact words "passed out" had not been used before. (*Id.* at 48-52).

Concerning the court's denial of Appellant's continuance request, Appellant's expert pediatric pathologist initially indicated that she would be

available for trial. Prior to trial, however, the pathologist said she had a "health" issue, and she no longer wished to participate. The court denied Appellant's request for a continuance because the pathologist who performed the autopsy was testifying, and Appellant could cross-examine this witness about the cause of death. The court emphasized that the person who performed the autopsy was in the best position to testify about K.B.'s cause of death. Additionally, a continuance would have prejudiced the Commonwealth, where one of the Commonwealth's expert witnesses had to fly from overseas to attend trial, and multiple other witnesses were flying from out of state and arriving the day Appellant requested the continuance.[3] Further, the defense had not identified a specific expert to retain and it was speculative whether Appellant could even obtain such an expert witness to support the defense theory of the case. (**Id.** at 52-56).

With respect to Appellant's challenge to the court's admission of K.B.'s autopsy photographs, the court deemed such photos necessary to establish the cause and manner of death and for the Commonwealth's expert to explain his opinion. The court determined that the probative value of the photographs outweighed prejudicial impact. Additionally, the court allowed the autopsy photographs to be shown to the jury for seconds, not minutes. Further, the

_____

[3] We note that Appellant moved for a continuance only five days prior to the start of trial, even though defense counsel had known for several weeks that his proffered expert was no longer willing to testify. Further, trial had already been continued once before as a result of the pandemic.

court provided multiple cautionary instructions. (*Id.* at 56-61).

Finally, as to Appellant's challenge to the denial of proposed *voir dire*, Appellant's proposed question with respect to the autopsy photographs of a child did not relate to whether a prospective juror could render a fair and impartial verdict based on a fixed opinion or bias. Consequently, the rejected question was irrelevant to the legitimate purposes of *voir dire*.[4] (*Id.* at 61-64).

The record supports the court's sound analysis regarding each issue presented on appeal. Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

_____

[4] On appeal, Appellant also complains the court rejected proposed *voir dire* questions concerning the allegations in the case and the ages of the victims. Nevertheless, Appellant fails to specify in his brief the place in the record where the court denied this proposed *voir dire* question. Our review of the record suggests that the parties had a discussion off the record regarding Appellant's proposed *voir dire*. The record further indicates that the *voir dire* of prospective jurors was not transcribed. (*See* N.T. Trial, 10/25/21, at 10). Following *voir dire* of the jurors, however, Appellant renewed on the record his request for a proposed question with respect only to the autopsy photographs. The court denied Appellant's request, stating that the court would repeat cautionary instructions to the jury when the photographs were shown. (*Id.* at 48-49). Under these circumstances, to the extent that Appellant now complains the court improperly denied his proposed *voir dire* regarding questions about the nature of the allegations in the case and the ages of the victims, we deem those sub-issues waived. *See Commonwealth v. Harris*, 979 A.2d 387 (Pa.Super. 2009) (stating when allegation is unsupported by citation to record such that this Court is prevented from assessing issue and determining whether error exists, allegation is waived for purposes of appeal).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>2/21/2023</u>

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY
PENNSYLVANIA
CRIMINAL DIVISION


COMMONWEALTH OF PENNSYLVANIA :      CP-46-CR-0004273-2019

          V.              :

MARQUIS LAMONT THOMAS      :       **17 EDA 2022**


## **1925(a) OPINION**

**CARPENTER  J.**                    **FEBRUARY 16, 2022**

## INTRODUCTION

Appellant, Marquis Thomas, appeals from the judgment of
sentence imposed on October 28, 2021, after a jury found him guilty of first-
degree murder, aggravated assault, simple assault – under age of 12,
endangering the welfare of a child – course of conduct, strangulation –
family/household member, aggravated assault, simple assault – under age of
12, and endangering the welfare of a child – course of conduct. Appellant's
convictions arose out of the October, 2016 death of his girlfriend's, Pailenn
Bunrout, four-year-old daughter, K.B. In addition, his convictions arose out of
the abuse of his girlfriend's then 10-year-old son, D.B. in 2018. In 2019, D.B.,
disclosed that Appellant had choked him, and had done so several times, and
had engaged in other abusive behaviors. At the time of the respective crimes,
Appellant was living with his girlfriend, her children, K.B. and D.B., and a child
they shared together, K.T. K.B. and D.B. thought of Appellant as their father.

At trial, the defense asserted that K.B.'s cause of death was undetermined as reported by the Montgomery County Coroner's Office in its autopsy report, and the constellation of injuries that were found on her both externally and internally were likely caused by strenuous and improper resuscitation efforts as suggested by the autopsy report. In defense of the abuse to D.B., it was asserted that D.B.'S February 9, 2019, disclosure and his trial testimony were not credible.

On appeal, Appellant challenges the sufficiency of the evidence as to his conviction for first-degree murder; the weight of the evidence; the denial of a taint hearing; the admission of child hearsay under the Tender Years Act; the denial of a mistrial based upon an alleged discovery violation; the denial of a continuance request when the defense's pediatric pathologist became unavailable to testify; the admission of K.B.'s autopsy photographs; and the rejection of a proposed *voir dire* question regarding the autopsy photographs. Based upon the analysis as set forth herein, this Court respectfully suggests that these issues lack merit and that Appellant's judgment of sentence be affirmed.

FACTUAL AND PROCEDURAL HISTORY

On October 18, 2016, at about 7:51 a.m., Sergeant Geoffrey Wainwright, a veteran police officer with the Towamencin Police Department, received a 9-1-1 call to respond to Forge Gate Apartments at 1141 Snyder Road, Apartment I-16. Towamencin, Montgomery County. (N.T., Jury Trial, 10/25/21, p. 51, 52 - 53). The call was for an unresponsive four-year-old with

2

CPR in progress by someone on the scene. Id. at 53. Sergeant Wainwright and another officer responded within minutes at 7:53 a.m. Id. At the scene he saw a child on the floor, completely limp, and after finding no pulse he administered CPR. Id. at 56. When the other officer set up an AED, automatic external defibrillator[1], and he cut off the child's shirt to attach the electrodes, Sergeant Wainwright observed that the child had pronounced bruising on her lower abdomen, lower chest and abdomen. Id. at 56, 60.

Officer Wainwright testified that he has been extensively trained in pediatric CPR, which is what he used. Id. at 57, 58. He explained that using pediatric CPR he was careful not to compress K.B.'s chest cavity too far because a toddler requires less pressure than an adult, and that you don't want to cause damage. Id. at 58. After a short time, paramedics arrived and carried her to the ambulance. Id. at 59. While the paramedics worked on her, he took several pictures of K.B.'s bruises. Id. at 60.

Richard Roberts, an experienced EMT and assistant chief of the Volunteer Medical Service Corp ("VMSC") of Lansdale, also responded to the scene. Id. at 180 – 181, 183. He arrived at about 7:55 a.m., and got the child into the ambulance and started pediatric CPR, performing chest compression to her mid-sternum line. Id. at 183, 184, 186. When he was performing CPR he observed pre-existing trauma, namely bruising to the abdomen. Id. at 185, 186.

---

[1]     There are electrodes that monitor cardiac activity on two sticky plastic pads that adhere to the skin, which then can determine cardiac activity. (N.T., Jury Trial, 10/25/21, p. 56).

3

Cindy Christian, M.D., a professor at the Pearlman School of Medicine at the University of Pennsylvania and a pediatrician at Children's Hospital of Philadelphia ("CHOP"), was accepted as an expert in general pediatrics and child abuse pediatrics. Id. at 70, 82 – 83. On September 15, 2018, Dr. Christina testified that D.B. was admitted to CHOP, upon referral for an evaluation. Id. at 92. That morning D.B. woke up with severe subconjunctival hemorrhages in both of his eyes, whereby the whites of his eyes were filled with blood, and a bruise under an eye in association with that bleeding. Id.

When D.B. was admitted to the hospital, the child protection team at CHOP learned that D.B.'s sister, K.B., who had also been seen by the child protection team a few years earlier also presenting with significant subconjunctival hemorrhages died about a month and a half later. Id. at 92, 93. The child protection team also learned that K.B. died suddenly in her sleep, and that her cause of death was undetermined. Id. at 93. Based on this information, the team requested a copy of K.B.'s autopsy report from the Medical Examiner's Office in Montgomery County. Id.

Dr. Christian was shocked when she read the report to see that K.B.'s cause of death was recorded as undetermined based upon all of the injuries that the report documented. Id. at 94. K.B. was noted to have multiple severe injuries to her skin, her conjunctiva, to her heart, and to her liver. Id. There was evidence of two healing rib fractures, severe bruising to her chest and abdomen, and enormous amounts of blood in her chest cavity and

4

blood in her abdominal cavity. Id. The doctor opined that these injuries were the result of trauma and not from CPR. Id.

After all of this information came to light, the Montgomery County District Attorney's Office requested that Dr. Christian review investigative and medical material in connection with K.B. and D.B.'s injuries. Id. at 95. Based upon her review, Dr. Christian opined that K.B's injuries sustained in September of 2016 were the result of child physical abuse, and that her death was a result of severe inflicted trauma and physical abuse. Id. As to D.B's injuries that were documented at CHOP in September of 2018, the doctor opined that they were the result of child physical abuse. Id.

Specifically, as to K.B., Dr. Christian described K.B. as generally a healthy child. Id. at 102. According to K.B.'s medical records, she had a history of G6PD deficiency[2], a benign condition in K.B.'s case; eczema; and asthma. Id. at 103, 104. The doctor stated that the G6PD deficiency does not cause bleeding or bruising. Id. at 104. K.B. had also underwent a tonsillectomy and adenoidectomy, which is significant for the fact that there were no bleeding issues related to that surgery. Id. at 104 – 105. Based upon this, the doctor ruled out a bruising or bleeding disorder as a cause of the significant bruising to her abdominal wall, her chest, and her extremities that was found at that time of her death. Id. at 105.

---

[2]    Doctor Christina described G6PD deficiency as a fairly common red blood cell enzyme deficiency, and that most of the time children with this deficiency are perfectly fine. (N.T., Jury Trial, 10/25/21, pp. 102 – 103).

5

Dr. Christian, described K.B.'s visit to CHOP in September of 2016, and detailed the findings from that hospital visit. On September 4, 2016, K.B. was admitted to CHOP because she woke up the previous morning with subconjunctival hemorrhages, and a little bruising underneath the eye. Id. She had been referred to CHOP by Grandview Hospital for the evaluation of suspected child abuse. Id.

Once at CHOP, K.B.'s history was taken. Id. at 106 – 107. K.B. was nonverbal, and her examination revealed that she had symmetrical bite marks on her tongue, that were beginning to heal, and blisters thought to be from biting her tongue. Id. at 107, 108. She had the subconjunctival hemorrhage of the eyes, with a purple bruise under the left eye. Id. at 108. K.B.'s skin had multiple linear hyper- and hypopigmented injuries on her abdomen around her belly button. Id. at 108 – 109. Her back had a vertical, healed hyperpigmented scar spanning the length between her shoulder blades. Id. at 109. In the middle of her lower back she had very thickened skin with scabbing. Id. There were four linear lines of hypermigmented, dark colored, parallel marks on her right flank. Id. Imaging studies of K.B. showed that she had a healing posterior rib fracture of the right seventh rib and the left anterolateral with callous, meaning that those injuries were healing and were weeks old and not brand new. Id. Based upon a review of K.B.'s medical records, the doctor's diagnosis was that she was a victim of physical abuse and repeated injury. Id.

Dr. Christina summarized K.B.'s injuries this way: K.B. had a new injuries, subconjunctival hemorrhages, and biting of her tongue; and she had

old injuries, she had scars around her torso, scars on her back and two healing rib fractures. Id. K.B's injuries were also found in multiple organ systems – her skin had injury, her bones had injury, her eyes had injury, and her mouth had injury. Id. at 110. Further, K.B. had unusual injuries – such as those to her tongue and patterned injuries, such as the parallel lines on her back. Id. at 111. The doctor opined that this constellation of injuries are not what they see in active children who have accidental trauma. Id. at 110. She further explained that the subconjunctival hemorrhage, which was pretty significant bleeding in K.B.'s case, can either been from direct blunt trauma to the eye or from Valsalva trauma, the kind of trauma that results from significant increased pressure of the eye that causes pop vessels to pop. Id. at 111. The doctor opined that that kind of pressure can come from strangulation or severe chest compressions. Id. In 2016, the opinion of the child protection team was that these injuries were concerning for child abuse, specifically the rib fractures which are very unusual in healthy four-year-olds. Id. at 112.

Dr. Christian discounted that the subconjunctival hemorrhages could have been caused by vomiting based upon the extensive nature of blood in her eyes. Id. at 115. In addition, the doctor testified that the bilateral nature of the subconjunctival hemorrhage indicated that it was not caused by blunt impact injury to both eyes, but rather from caused by severe compression, either of her neck or severe compression of her chest. Id. at 116 - 117.

Dr. Christian explained that the injuries to K.B.'s tongue were most likely that K.B. bit on her tongue. Id. at 118. And those to her flank, the

7

linear parallel lines, were most likely caused by the child being struck with something that was the width of those marks. Id. at 119. The doctor described the likely mechanism of the rib fractures, either that K.B. might have been severely squeezed, as if someone had sat on her or crushed her in some way, or from blunt impact to those ribs. Id. at 120. She opined that in children these kinds of fractures are usually due to severe squeezing. Id. Again, the doctor discounted that these rib fractures could have been a result of K.B. falling off a bunk bed. Id. at 120 – 121.

About six weeks after K.B. was discharged from the hospital, she died on October 18, 2016. Id. at 121 – 122. Dr. Christian reviewed K.B.'s autopsy, and her opinion was that she was severely beaten and that she died of trauma. Id. at 122. She categorically denied that the injuries she saw documented in K.B.'s autopsy could have been caused by CPR. Id. at 123. She stated that in her experience, throughout her whole career, and education she has, "[n]ever ever" seen these kind of injuries caused by CPR. Id. at 123. In fact, she stated that the vast majority of children who undergo CPR have zero injuries. Id. at 124. That's based on her personal experience and what is documented in the medical literature, that maybe one percent of children who undergo CPR have injuries from CPR, and if they do, they will have a single injury. Id.

D.B. was also evaluated at CHOP in September of 2016, at the same time of K.B.'s evaluation, based upon a concern that K.B. was a victim of

8

child abuse. Id. at 125. He was seen and he did not have significant injuries, so he was discharged. Id.

Around the time of September 15, 2018, when D.B. presented at CHOP with the same subconjunctival hemorrhages as his sister about two years earlier, D.B. was detailed as having a G6PD deficiency, eczema, asthma, and a benign heart murmur. Id. at 127 – 128. On September 15, 2018, he was seen at CHOP because he woke up in the morning with severe subconjunctival hemorrhages in both eyes. Id. at 128. It was documented that the entirety of the whites of his eyes were completely bloody. Id. at 129, 131. Dr. Christian testified that in her experience in evaluating thousands of children she had never seen subconjunctival hemorrhages that were that severe. Id. at 132. Dr. Christian opined that the mechanism that caused it was severe Valsalva, i.e., pressure, consistent with some kind of severe compression, strangulation or asphyxiation. Id. The doctor further testified that while at CHOP, D.B. was screened by multiple consultants, and they found no medical disease that explained the bleeding in his eyes. Id. at 133. They even tested him for things they didn't really think he had, just to be sure he didn't suffer from any of them. Id. at 134. They wanted to rule everything out. Id. D.B.'s mother did not agree with the diagnosis of non-accidental trauma/child abuse, so she had taken him to Cincinnati Hospital, and there they did not think that there was anything else they would recommend as part of an evaluation for him. Id. at 134. It was their opinion that there was no need for additional testing for a medical cause. Id.

9

Dr. Christian testified as to asphyxiation. Id. at 134 – 135. She explained that there are multiple ways to prevent people from getting oxygen to their bodies such as suffocation by putting a pillow over someone's head or a chokehold with an arm around a neck. Id. at 136. More specifically, the doctor explained that strangulation is a form of asphyxiation, and that it can cause subconjunctival hemorrhages. Id. at 138. It can also cause petechiae, which are small broken blood vessels in the skin. Id.

Dr. Christian discussed the similarities between some of the injuries K.B. sustained to the injuries that D.B. presented with in 2018, and the significance of these similarities. Id. at 138 – 139. First, she said that they both had really rare findings, which suggested that similar things happened to both of them that caused these findings. Id. at 139. Additionally, the doctor testified to the disclosures that D.B. later made in February of 2019, about the abuse was consistent with his injuries, specifically that he couldn't breathe and he was being held in a chokehold. Id. at 140.

On the second day of trial, the Commonwealth presented the testimony of D.B. At the time of trial he was 11 years old. (N.T, Jury Trial, 10/26/21, p. 11, 12). He was currently living outside of Pennsylvania with his grandparents and his younger sister. Id. at 12. He testified that he used to have another sister, K.B., who died when she was four years old. Id. at 13. He was in court because Appellant, who he used to call "dad", hit him more than once. Id. at 15 – 16. At some point he told his mom. Id. at 16. D.B. recalled that when he told his mom, he was in his room, and that his mother was

10

shocked. Id. at 17. When his mom came to talk to him, that although he did not remember her exact words, he remembered that his mother asked him if Appellant hit him and he responded that he had. Id. at 19. He was nervous telling her, but relieved once he did. Id. After he told his mother, they went to the police department. Id. at 19 – 20. When they got there, he was with his grandmother and his mother went to a separate room. Id. at 20. D.B. testified that no one asked him any questions at that time. Id. The next day, he remembered going to Mission Kids where he spoke to Ms. Maggie. Id. There he told her that Appellant had hurt him. Id.

In the house he lived in with his mom, K.T, and Appellant, Appellant had hurt him, and it happened in the living room and it was usually at night when his mom and K.T. were sleeping. Id. at 23 - 24. Appellant put him arm around D.B.'s neck in a chokehold position. Id. at 25. D.B. described that Appellant would push him over so he would be face down on the couch and then put him in a chokehold position. Id. at 25 – 26. It would hurt and D.B. would be unable to breathe. Id. at 25. D.B. explained that it would feel a lot of pressure in his head and that he would pass out. Id. at 26. D.B. described other instances of abuse where at other times, Appellant would make him sit with his back against the wall and pretend he was sitting on a chair for a long period of time. Id. at 27. D.B. testified that his body would burn and shake. Id. Appellant would also make D.B. balance on his head, which gave headaches and would hurt. Id. at 28. D.B. was forced to do pushups, which left

11

D.B. feeling sore. Id. at 30. Appellant told D.B. that his mother told Appellant to do this to him. Id. at 31.

D.B. testified about the most recent hospital visit when his eyes were red. Id. at 32. D.B. explained that the night before he was face down on the couch, and Appellant put his arm around his neck. Id. at 32, 34. It made his body feel very hot. Id. at 34. The next thing that D.B. knew was that he woke up in his bed. Id. His head was hurting very bad and his eyes were red and hurting. Id. at 35. The next morning, Appellant woke up D.B. and saw his eyes were red, and Appellant called his mom. Id. at 36. D.B. was scared of dying because the same thing happened to his sister, K.B. Id. at 36 – 37. Appellant told D.B. not to say anything, which he understood Appellant to mean about the night before. Id. at 37. At the hospital he spoke to Ms. Maggie, but he did not tell her what Appellant had done. Id. at 37 – 38. He also did not say anything to his mom because he was nervous. Id. at 38.

K.B.'s and D.B.'s mom, Painlenn Bunrout, testified that back in September of 2016, she was in a relationship with Appellant, and had been since 2014. Id. at 79 – 80. Appellant was not a biological father to either K.B. or D.B. Id. at 81. On September 2, 2016, Ms. Bunrout recalled that she was working as the bakery manager at a local supermarket. Id. at 83. At around 8:12 a.m., she received a text from Appellant about K.B.'s eyes. Id. at 84, 85. Ms. Bunrout took K.B. to her doctor immediately, who told her that it looked like abuse. Id. at 88 – 89. Ms. Bunrout did not believe that, because she couldn't imagine anyone would hurt her kids. Id. at 89 – 90. Text messages

12

between Ms. Bunrout and Appellant reveal that Appellant was concerned that he would be suspected of abuse. Id. at 92.

Ms. Bunrout took K.B. to CHOP where they performed additional tests. Id. at 93. She was told that the red eyes could be from asphyxiation and that she was being abused, which Ms. Bunrout did not believe. Id. at 93, 94. After K.B. was discharged from CHOP, there was a safety plan put in place, whereby she and Appellant were not permitted to see the kids without supervision. Id. at 94. This plan lasted only several weeks. Id. Ms. Bunrout was concerned about K.B.'s health and feared that she was slowly dying. Id. at 107 – 108. However, she was scared to get a second opinion out of fear her kids would be taken away. Id. at 106.

Ms. Bunrout testified about the night before October 18, 2016, when she had given K.B. a bath, K.B. did not have any bruising. Id. at 110 – 11. And because Ms. Bunrout had to be at work early the following day at 4:00 a.m., she went to bed at 9:00 p.m. the night before. Id. at 110 - 111. At about 7:45 a.m. on October 18, 2016, she received a text from Appellant saying, "You need to come home right now. I can't wake [K.B.] up. I don't' know what to do. Hurry." Id. at 112. Ms. Bunrout called Appellant, and told him to call 9-1-1. Id. at 112. She left work and got home about three minutes later, where she saw K.B. laying in her bed. Id. at 113. She tried to wake her, but she wouldn't wake up. Id. Ms. Bunrout called 9-1-1, since Appellant had not called. The 9-1-1 operator was directing Appellant how to perform CPR, and Appellant did so on her mid-chest area. Id. Police arrived quickly. Id. at 115. The police cut off

13

K.B.'s shirt, and Ms. Bunrout saw a bruise on K.B.'s abdomen, that she did not have the night before. Id.

Next, Ms. Bunrout testified as to when D.B. woke up with the subconjunctival hemorrhages. On September 14, 2018, the night before D.B. woke up with his injury, Ms. Bunrout went to bed about 9:30 p.m. because she had to be at work the following day at 5:00 or 5:30 a.m. Id. at 117, 118. Both Appellant and D.B. were still awake. Id. at 117. At about 8:49 a.m., Ms. Bunrout received a text from Appellant saying, D.B. "busted a vessel in his eyes or something," and sent her a picture Id. at 119 – 120. Ms. Bunrout thought of her daughter K.B., because it looked like blood in his eyes. Id. at 120. Ms. Bunrout was sent to CHOP by her doctor. Id. at 121. At CHOP the doctors told her that D.B. was being abused. Id. She was in complete disbelief. Id. D.B. remained hospitalized to be evaluated. Appellant denied ever hurting D.B. Id. at 123. Ms. Bunrout wanted to get a second opinion, so she took D.B. to Cincinnati Children's Hospital, who ultimately told her to trust the opinion she received from the CHOP doctors. Id. at 124 – 135.

Once D.B. was released from CHOP, D.B. went to live with his maternal grandparents. Id. at 125. Only Ms. Bunrout was permitted supervised visits. Id. at 124. She would spend her time with D.B. and K.T. every day after work. Id. at 125. On evening on February 8, 2019, Ms. Bunrout received a call from Tina Wright who was coming to the house. Id. at 127. Ms. Bunrout testified that she neither knew Ms. Wright or why she was coming over. Id. When she arrived, she told Ms. Bunrout that she had received a complaint that

14

the grandparents were coaching the kids. Id. at 128. D.B. was not present during this conversation, he had gone to his bedroom. Id. at 128. The conversation between Ms. Bunrout and Ms. Wright lasted about an hour. Id. at 129. After Ms. Wright left, Ms. Bunrout called Deseree, the case worker assigned to the case at Children and Youth, and discussed Ms. Wright's visit. Id. Deseree suggested for Ms. Bunrout to ask D.B. about it. Id. at 130. After this conversation, Ms. Bunrout went to talk to D.B. Id. at 133.

Ms. Bunrout said to D.B., that if he was telling people his grandparents were coaching him he should tell mommy. Id. at 134. D.B. responded with, He did it, and that it was dad. Id. Ms. Bunrout followed up with, Did what? Id. D.B. demonstrated putting his hands up to his neck like a choking motion. Id.

Immediately after this disclosure, Ms. Bunrout went to the police station with D.B. and her mother to report the incident. Id. at 134 – 135. D.B. did not give a statement to police, but went the next day to Mission Kids. Id. at 135. As of the time of the trial, Ms. Bunrout had not spoken to D.B. about the abuse since he disclosed to her. Id. at 137.

At trial, Deseree Purday, a supervisor with Justice Works, testified. Id. at 175. Justice Works is a service employed by the Office of Children and Youth when they need assistance with a family with various resources or to monitor the safety of the children in the home. Id. On February 8, 2019, she confirmed that she had a conversation with Ms. Bunrout, in which she suggested to just talk to D.B., to let him know that you're there to

15

help him, protect him, and support him. Id. at 181. About fifteen minutes after that phone call, Ms. Bunrout called her back, and she was crying. Id. Ms. Bunrout was very upset. Id. Ms. Purdy advised her to take D.B. and go make a police report. Id. at 182.

Detective Kathleen Kelly of the Montgomery County Detective Bureau – Special Victim's Unit, was assigned to assist Hatfield Police Department based upon a child line referral filed by medical doctors at CHOP regarding D.B. on September 18, 2018. Id. at 204 – 205. She was notified that D.B. was in the hospital with hemorrhaging in his eyes. Id. at 205. And that it was significant because his sister had similar injuries about a month before she died in 2016. Id. She also knew that the investigation into K.B.'s death was closed because it wasn't ruled a homicide. Id. It was ruled undetermined. Id. The detective's purpose in responding to the hospital was that there was going to be an emergency forensic interview there. Id. at 206. Detective Kelly was present for that interview, in a separate room. Id. D.B. did not disclose abuse during that interview. Id. Later, on February 8, 2019, the detective did learn that D.B. disclosed abuse. Based upon this information, she was present when D.B. was interviewed the second time on February 9, 2019. Id. at 206 – 207.

Also as a part of this investigation, Detective Kelly reviewed the download of Appellant's cell phone that was conducted by detectives in 2016, after K.B. died. Id. at 207. The detective found that the morning K.B. died on October 18, 2016, Appellant texted Ms. Bunrout around 7:45, 7:44 that he couldn't wake K.B. up, and that the web history on his phone showed that

16

Appellant had been searching how to perform CPR at about 7:22, 7:21 a.m. Id. at 207, 210. Specifically, Appellant searched "Sounds when performing CPR" at 7:21 a.m. Id. at 210 – 211. He clicked on a link for "gasping is not breathing" from the Sarver Heart Center website. Id. at 211. At 7:22 a.m., Appellant clicked on the link for "CPR steps, performing CPR," from the American Red Cross. Id. At 7:25 "gurgling during CPR," google search. Id. At 7:25, "lungs gurgle when doing CPR, doctor answers on Healthcare Magic" and "lungs gurgle when doing CPR, doctor answers on Healthcare Magic." Id. at 211 – 212. At 7:25, "CPR classes, don't' be fooled by Agonal breaths." The next item that the detective found was the text that Appellant sent to Ms. Bunrout at 7:45, "You need to come home right now. I can't wake [K.B.] up." Id. at 212. Detective Kelly testified that in her review of Appellant's downloaded phone she did not find any indication that he called 9-1-1. Id. at 213.

Maggie Sweeney, currently a forensic interview specialist with the FBI, previously worked for Mission Kids Child Advocacy Center as a forensic interviewer and program manager. Id. at 220, 221. Mission Kids is a place where all of the agencies that are responsible for investigating child abuse can come together to hear the same thing all at the same time, to obtain a statement from a child in regards to a child abuse investigation. Id. at 220 – 221. Ms. Sweeney explained that a forensic interviewer is a specially trained person that can ask questions of a child in a developmentally sensitive way. Id. at 221. The way that the questions are asked are open-ended, non-leading questions to elicit the most accurate information form a child. Id. at 221 – 222.

17

The first time Ms. Sweeney interviewed D.B. was in September of 2016. Id. at 225. In September of 2018, Ms. Sweeney conducted another interview with D.B., about different allegations than in 2016. Id. In 2018, it was an allegation of abuse involving D.B. Id. The interview took place at CHOP. Id. During this interview, D.B. did not disclose any abuse. Id. at 226. On February 9, 2019, another interview was conducted with D.B. Id. at 226 – 227. It was conducted because Ms. Sweeney was informed that there was new information. Id. at 227. The Commonwealth played the video-recorded relevant portions of the interview for the jury. Id. at 230, see Exhibit "C-23A."

On the third day of trial, the Commonwealth called its final witness, Samuel Gulino, M.D., an expert in forensic pathology. (N.T., Jury Trial, 10/27/21, p. 10, 26). Dr. Gulino reviewed the circumstances of K.B.'s death and the circumstances surrounding the injury to D.B. Id. As part of his review he read the report that the Montgomery County Coroner's Office prepared in K.B.'s case. Id. at 27. In particular, he was aware that the doctor who performed the autopsy on K.B. concluded that the injuries she saw were largely artifacts of resuscitation. Id. at 28. Dr. Gulino disagreed with that finding, based upon the types of injuries, the extent of the injuries, and the number of injuries seen on K.B., that they were not consistent with having been caused by CPR. Id. at 28.

The doctor opined that K.B.'s hospital records in September of 2016 were significant for the presence of hemorrhages in the white part of her eyes, the subconjunctival hemorrhages; bruising of her face; injury to her

18

tongue; two healed fractures; and multiple scars. Id. at 28 – 29. He believed these to be inflicted injuries. Id. at 29. He explained that these subconjunctival hemorrhages can be caused in one of two ways. Id. at 30. One is that they can be caused by a direct blow to the eye, a punch or an object, that can cause bleeding on the surface of the eye. Id. at 30. They can also be caused by pressure – of blood being forced back up into the face by constriction around the neck or around the torso. Id. Dr. Gulino testified that at autopsy the most common situation that he has seen these types of injuries are in people who have had some kind of impact trauma such as a motor vehicle accident, people struck by vehicles, etc. Id. He has also seen them in cases of strangulation, typically manual strangulation. Id.

Dr. Gulino rejected the Coroner's autopsy report that K.B.'s injuries were the result of the artifacts of CPR. In general, Dr. Gulino discussed resuscitation injuries in children as presented in the medical literature. Id. at 32 – 34. While CPR injuries can occur in children as they do in adults, they are most commonly found on the skin in places where you're putting your hands to perform compressions. Id. at 34. Occasionally CPR can result in internal injuries, including things like rib fractures, although it is far less common in children than adults. Id. He contrasted this to K.B.'s case, where none of the medical literature has documented children with multiple injuries of the severity and type that he saw in K.B.'s case. Id. The doctor explained that based upon his experience of having examined hundreds of children, and the collective experience in forensic pathology, he is aware of what the patterns of

19

resuscitation injuries are, and when you see injuries outside the established pattern of what is expected, that raises a red flag that the injuries could be from something other than CPR. Id. Additionally, as a forensic pathologist he looks to autopsy evidence that the injuries occurred in some fashion other than would be consistent with CPR because of their location, because of their severity, and because of the fact that they had significant internal bleedings associated with them which you would not see in a child who is dead and had only having CPR performed on them. Id. Dr. Gulino testified that in his years of experience he has never seen a case where a child received the constellation of injuries K.B. received that were caused by CPR. Id. at 37. Nor had he ever seen such a case in the medical literature that is similar or consistent with K.B.'s case. Id.

Dr. Gulino also addressed an aspect of the Montgomery County's Coroner's report that references Long QT Syndrome. Id. He explained that Long QT Syndrome is a genetic disease, an electrical abnormality in the heart, which can only be diagnosed in a living person and can't be seen at an autopsy. Id. at 38. He believed that it was put in the report essentially giving a possibility of why K.B. might have died because aside from all of her injuries the autopsy was normal. Id. at 37 – 38. There was no disease identified which would have caused her death. Id. at 38. He further explained that there is a genetic test that can be performed with a specimen of blood to diagnose this condition, and that it should have been done if you are looking for an explanation for death. Id. at 39.

20

As to the actual autopsy, Dr. Gulino identified an injury, a ragged laceration of the inferior vena cava – which is associated with epicardial hemorrhage. Id. The doctor explained that the inferior vena cava is the large vein that brings blood back to your heart from the lower half of your body, from your diaphragm down. Id. at 39 – 40. He further explained that if you have a great deal of force being applied, you can actually get a tear in this vein right where it goes into the heart. Id. at 40, 41 - 42. And that is precisely what he found in K.B.'s autopsy photographs. Id. at 40 – 41. Although not in the autopsy report, this injury was evident in the photographs. Id. at 42. Dr. Gulino testified that there is simply no support in the literature or his experience that this resulted from CPR. Id. at 46. Additionally, the presence of the hematoma, the collection of blood, on the surface of the liver caused by the injury, indicates that it occurred during life. Id. at 46

Dr. Gulino discussed K.B. external injuries, and observed that she had a number of bruises on her torso and extremities, not only to her chest, but also to her abdomen and on the sides of her chest; she had subconjunctival hemorrhages on her right eye; she had petechiae, small pinpoint hemorrhages of the skin of her face, the linings of her eyelids, and on the surface of her eye; she also had injuries on her back. Id. at 47. As to the bruising, Dr. Gulino opined that it was the result of blunt impact at the time she was alive. Id. at 47 – 48. He explained that in order to bleed into the skin, you have to have a pulse and a blood pressure. CPR is not going to cause bruising in areas of the side of the abdomen, the leg, and the arm. Id. at 48.

21

As to K.B.'s internal injuries, Dr. Gulino testified that in addition to the injury to the inferior vena cava, there was a laceration of the left lobe of the liver; there were areas of bruising in the intestinal mesentery, which is the connective tissue that contains all the blood vessels that go to your intestines; bruising around the pancreas; bruising on the surface of the stomach; and bruising down on the surface of her urinary bladder. Id. These injuries indicate that there was force being applied in multiple areas of her abdomen. Id. at 51. Dr. Gulino opined that these injuries were caused by blunt trauma. Id. He further explained that the injury to K.B's urinary bladder and the location of the liver laceration are not indicative of CPR injury. Id. at 51 – 52. K.B. also had injuries in her chest cavities, including pulmonary contusions, which are bruising in the lungs caused by trauma. Id. at 53. There was also a laceration to the right ventricle of the heart. Id. at 54. Dr. Gulino disagreed with the autopsy report that concluded that the "bloodless nature of the lacerations show that they were inflicted as a result of prolonged and robust resuscitation efforts." Id. at 54. He said that that conclusion does not make sense because there was a large area of bleeding associated with the laceration of the inferior vena cava; bleeding on the surface of the various organs, including the urinary bladder and on the surface of the stomach; bleeding into the lungs; and an epicardial hemorrhage associated with the laceration to the right heart ventricle. Id. at 54, 55 – 56. The presence of the blood indicates to the doctor that K.B. was alive at the time these injuries occurred. Id. at 56.

22

Dr. Gulino found evidence of strangulation. Id. at 58. He noted the subconjunctival hemorrhage on the surface of the eye, petechiae on the skin of the face, soft tissue hemorrhages in the neck, in the muscles, and then also in the deep tissues of the neck near the carotid artery on the right. Id. at 60. These are consistent with pressure being placed on the neck. Id. Ultimately, Dr. Gulino concluded that K.B. died as a result of blunt impact trauma associated with strangulation, and that the manner of death as homicide. Id. at 62, 63. After Dr.'s Gulino's testimony concluded, the Commonwealth rested. Id. at 95.

The defense presented the testimony of Marianne Hamel, M.D., who was qualified as an expert in forensic pathology. Id. at 107. She conducted the autopsy of K.B. in the Montgomery County Coroner's Office. Id. at 107 – 108. As part of the autopsy she performed an external examination in which she found a series of fresh bruises down the front of her chest and abdomen in the middle. Id. at 111. She also found bruising about K.B.'s jaw and on her extremities. Id. There was a hemorrhage in one of her eyes and some petechial hemorrhages of her face. Id. Next, Dr. Hamel conducted an internal examination where she found several serious injuries. Id. at 117. In particular K.B. had a laceration, a hole or tear in her pericardium, the sack around her heart, which was about a quarter of an inch. Id. at 117 – 118. She also found a tear of her heart valve in the right ventricle. Id. at 118. There was blood around the cavities around her lungs; bruising of the roots of her lungs; a hemorrhage of her central diaphragm; a laceration of her liver; blood in her abdominal

23

cavity; diffuse hemorrhage in the soft tissue surrounding where he intestines are attached; and some hemorrhage of her pancreas and bladder wall. Id. Dr. Hamel testified that all of these injuries were roughly up and down the middle of her body. Id. Dr. Hamel detailed various injuries such as tiny punctate pinpoint area of hemorrhage between her muscles in the muscles between her ribs, a hemorrhage in a neck muscle on the right and left side. Id. at 119.

The doctor discussed the laceration to K.B.'s liver. She found it had a rip on the left lobe. Id. at 120. The laceration was ragged, but she did not observe any blood with that space. Id. at 121. She further observed "only a hundred cc's of blood in her abdominal cavity." Id. at 121. It was her opinion that this was not a very big amount of blood in K.B.'s abdominal cavity, and the reason for that was that K.B. was already dead when she received that injury, concluding that the injury was a result of resuscitation efforts. Id. at 121. She explained that had K.B. been alive and received a blow to the abdomen that caused a two inch laceration to her liver, she would have expected to have a "belly full of blood." Id. Dr. Hamel discounted the hemorrhage in the liver that Dr. Gulino observed as having occurred during life, reasoning that CPR could have restored circulation and simultaneously caused injury. Id. at 123. She remained adamant in her belief that that injury was a result of CPR and that K.B. was not alive when that injury was inflicted. Id. Dr. Hamel also discounted that the injury to K.B.'s vena cava was caused while she was alive. Although she did not find this injury during her autopsy and while she did acknowledge that this injury could cause death if a person

24

was alive when such an injury is inflicted, she said that that finding did not change her opinion that CPR was the cause of K.B.'s observed injuries. Id. at 124 – 125. She believed it to be an insignificant injury. Id. at 124.

Dr. Hamel continued her testimony and detailed further injury to K.B.'s such as hemorrhaging around the pancreas, hemorrhaging to the connective tissue of the intestines where it attaches to the abdominal cavity, and hemorrhaging to the front of the bladder. Id. at 128. The doctor stated that the injury to the bladder was unusual because that's not usually a place where you give CPR. Id. As to the abdominal injuries, Dr. Hamel explained that while these injuries concerned her because CPR is not performed on this area, but rather on the chest, it could have been caused by someone panicked and an inexperienced CPR provider. Id. at 129.

A neck dissection was also performed by the doctor. This revealed a tiny hemorrhage on the inside side of the big muscle in the left side of the neck. Id. at 132. On the other side of K.B.'s neck, Dr. Hamel found that around the carotid artery there was a diffuse hemorrhage that was outside and in front of the vessel. Id. Dr. Hamel explained that although she found the hemorrhage in the right side of K.B.'s neck to be concerning, she discounted that it could have been caused by strangulation because she would have expected to see diffuse hemorrhage in the strap muscles on the anterior aspect of the neck, but she did not observe any injuries to that area. Id. at 136.

On cross-examination, Dr. Hamel acknowledged, among other things, that the medical literature reflects that CPR injuries in children are

25

extraordinarily rare. Id. at 142. She has never heard of a case like this where a child receiving the constellation of injuries found on K.B. was caused by CPR. Id. at 142 – 143. Dr. Hamel was confronted with a study entitled, Do Resuscitation-Related Injuries Kill Infants and Children, by Evan Matshes, which notes that blunt abdominal trauma particularly laceration of the liver or spleen or rupture/transection of a hollow vicus, in the absence of motor vehicle accidents, bicycle accidents, and falls from heights, should be considered victims of inflicted injury until proven otherwise. Id. at 144 – 145. While she agreed with that premise she dismissed that conclusion in K.B.'s case because she did not have a "belly full of blood." Id. at 145. She was also confronted with a study from Florida that dealt with hundreds of children over the course of ten years and did not find one child that had multiple injuries from CPR; a study from Germany and from Florida that both concluded that people that know the victim would be less forceful in their application of CPR; a German study that concluded that unexperienced bystanders who performed CPR were not more likely to increase the risk of injury from CPR; and another German study that concluded the duration of CPR maneuvers seems not to be associated with the existence of CPR-associated injuries in children. Id. at 145 – 147. She said that these studies do not change her opinion that K.B.'s constellation of injuries were the result of CPR. Id. at 147. Finally, Dr. Hamel acknowledged as true the medical literature in Dr. Byard's text about Death in the Young states that "severe multifocal injuries are not a feature of standard resuscitation," which is

26

the case with K.B., the existence of severe and multifocal injuries. Id. at 147 – 148.

Finally, Doctor Gulino in rebuttal testimony rejected Dr. Hamel's testimony that K.B. could not have died of blood loss. (N.T., Trial by Jury, 10/27/21, pp. 171 – 172). He stated that for a child such as K.B, it would take a loss of about 450 to 550 milliliters of blood to die from bleeding alone, and he testified that the autopsy documented the presence of a total of 330 milliliters of blood in the chest cavity and an additional hundred milliliters of blood in the abdominal cavity, which is a total of 430 milliliters. Id. at 172. This represented of about 40% of K.B.'s blood volume. Id. He said that that doesn't even take into account the blood inside the tissues that could not be measured, the blood in her lung tissue, in her bladder tissue, and the blood that was around her stomach and pancreas, and the blood on the surface of her liver. Id. He opined that all together that is about 550 to 600 milliliters of blood loss from the various injuries, which would indicate death from blood loss. Id. at 173.

At the conclusion of the four-day trial, the jury found Appellant guilty of the aforementioned charges. Sentencing was held immediately thereafter, where a term of life imprisonment was imposed. A timely post-sentence motion was filed, and was denied. This timely appeal followed.

## ISSUES

Pursuant to Pa.R.A.P. 1925(b), this Court directed Appellant to file a concise statement of errors complained of on appeal. Appellant did so, and raised the following issues as set forth verbatim below:

27

1. Did the trial court err in denying Appellant's post-sentence motion for a judgment of acquittal as to murder of the first degree in that:

   (a) the Commonwealth failed to present evidence that Appellant acted with the specific intent to kill; and

   (b) the Commonwealth failed to demonstrate that the decedent was in the sole custody of Appellant?

2. Did the trial court err in denying Appellant's post-sentence motion for a new trial as the verdict was against the weight of the evidence where the Commonwealth's case was riddled with inconsistencies and defied common sense as to the nature and extent of the juries allegedly sustained by the two children?

3. Did the trial court err in denying the Appellant's [the] opportunity to proceed to a hearing challenging the competency of a child witness for taint?

4. Did the trial court err in admitting child hearsay pursuant to the tender years exception?

5. Did the trial court err in denying Appellant's motion for a mistrial for a discovery violation where the child complaining witness disclosed additional facts to the Commonwealth during trial preparations and the Commonwealth failed to disclose this new information to Appellant prior to that witness's testimony?

6. Did the trial court err in denying Appellant's motion for a continuance where a pediatric pathologist became unavailable to testify?

28

7. Did the trial court err in admitting autopsy photographs of the four-year-old decedent?

8. Did the trial court err in declining to read the proposed voir dire questions to the jury panel regarding the nature of the offenses and the autopsy photographs of the four-year-old decedent to determine if potential jurors could set aside their passions and determine the matter based on the evidence presented?

See, Concise Statement of Matter Complained of on Appeal, filed 1/6/22.

## I. Sufficiency of the Evidence

First on appeal, Appellant claims that this Court erred in denying his post-sentence motion for a judgment of acquittal as to murder of the first degree in that (1) the Commonwealth failed to present evidence that Appellant acted with the specific intent to kill; and (2) the Commonwealth failed to demonstrate that the decedent was in the sole case and custody of Appellant.

When reviewing a challenge to the sufficiency of the evidence, our appellate court's standard of review is de novo, while its "scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner." Commonwealth v. Rushing, 99 A.3d 416, 420-21 (Pa. 2014). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000). The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Commonwealth v. Dix,

29

207 A.3d 383, 390 (Pa.Super. 2019). Further the trier of fact is free to believe, all, part, or none of the evidence presented when making credibility determinations. Commonwealth v. Beasley, 138 A.3d 39, 45 (Pa.Super. 2016) (citation omitted). "[Our appellate court] may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed." Commonwealth v. Smith, 146 A.3d 257, 261 (Pa.Super. 2016).

A conviction of first-degree murder requires the Commonwealth to prove beyond a reasonable doubt "a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill." Commonwealth v. Houser, 18 A.3d 1128, 1133 (Pa. 2011). See 18 Pa.C.S. § 2502(a). "Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another." Commonwealth v. Stokes, 78 A.3d 644, 650 (Pa.Super. 2013) (citation omitted). "The Commonwealth can prove this specific intent to kill from circumstantial evidence." Commonwealth v. Tharp, 830 A.2d 519, 523–524 (Pa.2003) (citation omitted).

a. Specific intent to kill

In this case, Appellant argues that there was insufficient evidence demonstrating that he acted with specific intent to kill for first degree murder. Dr. Gulino extensively explained to the jury his findings of the external and internal injuries to K.B.'s body. He ultimately opined that K.B. died of blunt impact trauma associated with strangulation, and that the manner of death

30

was homicide. Doctor Gulino found that the types, the extent, and number of injuries would not be consistent with CPR in children. He noted that he has personally never observed a similar external constellation of injuries, the presence of subconjunctival hemorrhages both eyes; bruising of her face; injuries to her tongue; two healed fractures; and multiple scars, to be as a result of CPR, nor does the medical literature support such a determination which actually state that CPR injuries are quite uncommon.

He detailed the autopsy findings, namely the ragged laceration to the vena cava, which he opined can be caused when a great deal of force is applied to the lower half of a body. That that kind of pressure can actually tear the vein where it goes right into the heart, which is what he found in the autopsy photographs. He additionally determined that there were other injuries which indicated that there was force being applied in multiple areas of K.B.'s abdomen, such as a laceration of the left lobe of the liver, bruising in the intestinal mesentery; bruising around the pancreas; bruising on the surface of the stomach; and bruising down on the surface of her urinary bladder. Dr. Gulino opined that these injuries were caused by blunt trauma.

Further, Doctor Gulino stated that in opposition to the autopsy report, these were not "bloodless" lacerations. He supported this by noting there was a large area of bleeding associated with the laceration of the inferior vena cava, bleeding on the surface of the various organs, including the urinary bladder and on the surface of the stomach, bleeding into the lungs, and an epicardial hemorrhage associated with the laceration to the right heart

31

ventricle. There was also evidence of strangulation, noting subconjunctival hemorrhage on the surface of the eye, petechiae on the skin of the face, soft tissue hemorrhages in the neck, in the muscles, and then also in the deep tissues of the neck near the carotid artery. He opined that these are consistent with pressure being placed on the neck.

Finally, Doctor Gulino rejected Doctor Hamel's testimony that K.B. could not have died of blood loss. He stated that for a child like K.B it would take a loss of about 450 to 550 milliliters of blood to die from bleeding alone, and he testified that the autopsy documented the presence of a total of 330 milliliters of blood in the chest cavity and an additional hundred milliliters of blood in the abdominal cavity, which is a total of 430 milliliters. This represented of about 40% of K.B.'s blood volume, which doesn't even take into account the blood inside the tissues that could not be measured, the blood in her lung tissue, in her bladder tissue, and the blood that was around her stomach and pancreas, and the blood on the surface of her liver. He opined that all together that is about 550 to 600 milliliters of blood loss from the various injuries, which would indicate death from blood loss.

In addition to Dr. Gulino's testimony, was the testimony of Dr. Christian. Dr. Christian reviewed K.B.'s autopsy, and her expert opinion was that she was severely beaten and that she died of trauma. She categorically denied that the injuries she saw documented in K.B.'s autopsy could have been caused by CPR. In her experience, throughout her whole career, and education she has, "[n]ever ever" seen these kind of injuries caused by CPR. In fact, she

32

stated that the vast majority of children who undergo CPR have zero injuries. That's based on her personal experience and what is documented in the medical literature, that maybe one percent of children who undergo CPR have injuries from CPR, and if they do, they will have a single injury.

Our Pennsylvania Courts have consistently rejected the premise that there must be evidence of a single fatal blow in order to find the specific intent to kill in cases where death results from the prolonged beating of the victim.

> Commonwealth v. Chambers, 602 Pa. 224, 980 A.2d 35, 46–48 (2009) (confirming the lack of merit to the "final fatal blow" argument and finding specific intent to kill where the defendant engaged in a continued pattern of child abuse and ultimately threw the three-year-old child across the room into a radiator and left her to suffocate between a bed and a wall); Commonwealth v. Powell, 598 Pa. 224, 956 A.2d 406 (2008) (rejecting claim of lack of evidence of specific intent to kill where the defendant repeatedly beat his six-year-old son, causing a seizure that resulted in death by asphyxiation because there is nothing in law requiring a final fatal blow to demonstrate a specific intent to kill); Commonwealth v. Smith, 544 Pa. 219, 675 A.2d 1221 (1996) (plurality) (finding sufficient evidence of first degree murder where a five-month-old baby died while in the defendant's care and expert medical testimony established that the cause of death was six to ten blows to the baby's head).

Commonwealth v. Woodard, 129 A.3d 480, 491 (Pa. 2015).

Notably the Pennsylvania Supreme Court noted in Powell, supra, wherein the Court stated:

> There is nothing in the law, logic, or human experience that provides, as a matter of law, that specific intent

33

> cannot be found when the medical examiner cannot point to a specific blow as the definitive cause of death. The very personal nature of a beating such as this negates the notion that a specifically identifiable killing blow is required to prove specific intent. After each beating, indeed, after each blow, appellant had time to reflect on what he was doing to his son. And, with the final "stomping" he administered to various vital parts of the child's body, appellant had ample time to appreciate the lethality of his conduct. The jury acted well within its authority in finding specific intent.

Powell, 956 A.2d at 417. Therefore, consistent with this case law examining a defendant's course of conduct in child abuse murder cases, there is sufficient evidence that Appellant possessed the specific intent to kill. The evidence viewed in the light most favorable to the Commonwealth as verdict winner, the evidence established that Appellant was responsible for K.B.'s death, and that he acted with the specific intent to kill by using deadly force on a four-year-old toddler, who she knew as her dad.

b. Sole custody

The "sole and exclusive custody" doctrine, is well established in Pennsylvania law. See Commonwealth v. Meredith, 416 A.2d 481 (Pa. 1980); Commonwealth v. Paquette, 451 Pa. 250, 301 A.2d 837 (Pa. 1973); Commonwealth v. Hart, 501 A.2d 675, 678 (Pa.Super. 1985). This doctrine provides that where, as here, an adult is given sole custody of a child of tender years for a period of time and, during that time, the child sustains injuries which unquestionably are neither self-inflicted nor accidental, the evidence is sufficient to allow the fact-finder to infer that the adult having custody inflicted the injuries. Paquette, 301 A.2d at 840. This rule, allowing an inference of

34

guilt, has been applied where a child suffers a fatal injury while an adult has sole custody of the child. Commonwealth v. Nissly, 549 A.2d 918 (Pa.Super. 1988). Thus, to invoke the sole and exclusive custody doctrine, the Commonwealth must show (1) serious injury or death, (2) that the injury was neither accidental nor self-inflicted, (3) that the injury was inflicted within a specific time period, and (4) that the defendant had exclusive custody of the victim during the time of the injury.

At trial, Ms. Bunrout testified that she started living with Appellant in January of 2016. (N.T., Trial by Jury, 10/26/21, p. 81). She lived there with Appellant, K.B., D.B., and eventually K.T., when she was born in September of 2016. Id. at 81 – 82. The night before K.B. died, she had given her a bath. She did not observe any bruising on K.B.'s abdomen or back areas. On October 18, 2016, Ms. Bunrout had to be up early for work, so the night before she went to bed at 9:00 p.m. She left for work at 3:30 a.m. At about 7:45 a.m., she received a text from Appellant saying, "You need to come home right now. I can't wake [K.B.] up. I don't' know what to do. Hurry."

Appellant in his post-sentence motion argues that "[s]pecifically, with respect to the times relevant to K.B.'s death, no testimony established that K.B. was alive at the time her mother left for work that morning. The Commonwealth failed to present evidence that her mother verified that K.B. was alive when she left their home for work that morning." See, Post-Sentence Motion, filed 11/8/21. However, this argument is of no moment. The time that K.B. died has never been fixed. The evidence did establish that Ms. Bunrout

35

went to bed at 9:00 p.m. on October 17, 2016, after giving K.B. a bath where she did not see any bruising on her. She left for work on October 18, 2016, at 3:30 a.m. The next event was the text from Appellant at 7:45 a.m., and that by the time police arrived at 7:53, K.B. had no pulse. The only people in the apartment during those hours were Appellant, D.B., and K.T. who was a newborn. Based upon this evidence, the jury properly concluded that K.B. was in the sole and exclusive custody of Appellant at the time she died.

## II.    Weight of the Evidence

Second, Appellant contends that this Court erred in denying his post-sentence motion for a new trial as the verdict was against the weight of the evidence where the Commonwealth's case was riddled with inconsistencies and defied common sense as to the nature and extent of the injuries allegedly sustained by the two children.

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. Our Supreme Court has explained that appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. A new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Stated another way, and as the trial court noted, this Court has explained that the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

36

Commonwealth v. Sullivan, 820 A.2d 795, 805–806 (Pa.Super. 2003) (citations and quotations omitted). The question the trial court must answer, in the sound exercise of its discretion, is whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Sullivan at 806, citing Commonwealth v. Widmer, 744 A.2d 745, 752 (Pa. 2000). Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. Widmer at 321, 744 A.2d at 753. "A trial court's exercise of discretion in finding that a verdict is or is not against the weight of the evidence is 'one of the least assailable reasons for granting or denying a new trial.'" Id., at 806, citing Widmer at 321, 744 A.2d at 753.

In this case, contrary to Appellant's assertion that the testimony was "riddled with inconsistencies and defied common sense as to the nature and extent of the injuries allegedly sustained by the two children," the testimony of both Dr. Christian and Dr. Gulino was credible and credited by the jury. First, as to K.B., both Dr. Christian and Dr. Gulino were absolutely consistent in their determination that the injuries that were observed on K.B. were not accidental and not the result of CPR; but instead intentionally inflicted injuries, namely strangulation and blunt impact trauma. Dr.

37

Christian, reviewed K.B.'s autopsy and determined that she was severely beaten and died of trauma. She categorically denied the premise that these injuries were caused by CPR, in that CPR injuries are exceedingly rare and if they do occur they involve a single injury not injury to multiple organs.

Like Dr. Christina, Dr. Gulino also disagreed with the coroner's findings that the injuries observed on K.B. were artifacts of resuscitation. He explained that the types on injuries, the extent of the injuries, and the number of injuries, are not consistent with injuries associated with CPR. He stated that none of the medical literature has documented children with multiple injuries of the severity and type that he saw in K.B.'s case. In fact, the defense's own expert, Dr. Hamel agreed that she has never heard of a case in the medical literature in which a child received the same constellation of injuries as K.B. to be caused by CPR. Dr. Gulino ultimately determined that K.B. died of blunt impact trauma associated with strangulation. This expert opinion is consistent with Dr. Christian's determination that K.B. was severely beaten and her death was caused by intentional trauma. Moreover, the jury did not credit the testimony of Dr. Hamel in her determination that K.B.'s injuries were a result of CPR.

As to D.B., Dr. Christian testified that the subconjunctival hemorrhages that he presented with in September of 2018 at CHOP were caused by severe Valsalva, i.e., pressure, consistent with severe compression, strangulation, or asphyxiation. The doctor also testified that the disclosures that D.B. made in February of 2019, about the abuse, was consistent with his

38

injuries; specifically that he couldn't breathe because he was being held in a chokehold. Additionally, D.B.'s trial testimony was consistent with his disclosure to his mother, i.e., that Appellant put him in a chokehold, and the disclosures he made in his February 9, 2019, interview with Ms. Sweeney.

III.    Taint Hearing

Third on appeal, Appellant contends that this Court erred in denying him the opportunity to proceed to a hearing challenging the competency of a child witness for taint.

On July 9, 2021, a second Pre-Trial Motions Hearing was conducted. At issue in part was whether a taint hearing was warranted. In support of a taint hearing defense counsel argued as follows:

> With respect to this matter, you have in 2018, September of 2018, the child at issue here wakes up, is found with redness in his eye, is taken to Children's Hospital in Philadelphia. While he's down at Children's Hospital in Philadelphia, he is interviewed extensively by Maggie Sweeney from Mission Kids. During that interview, the child indicates that no one had caused any harm to him at all. And that had been the case as far as all the evidence that I've been provided, all the evidence I believe that the Commonwealth has in its possession, that had been the case from September until February 8th of 2019.
>
> On February 8th of 2019, Tina Wright from the Department of Human Services in Philadelphia, arrives at the child's home where he's living at the time with maternal grandparents. When he arrives at the home -- or when she arrives at the home with maternal grandparents, she has a conversation with Pailenn Bunrout, the child's mother. And in this conversation, she details essentially what is going on with the

39

investigation. And she also indicates to the child's mother that the child needs to be believed.

Immediately following this meeting, the child's mother goes upstairs, has a one-on-one conversation with the child in the child's bedroom, at which point in time, low and behold, he discloses. Under these circumstances, I'd submit to the Court that there certainly are several issues with respect to taint. Number one, with respect to what the child heard with respect to those conversations; and, number two, specifically what the child's mother said at that point in time.

And in terms of background for that, too, there had been discussions before between the child's mother and my client who share another younger child together, which my client is the biological father of, about the fact that he was looking to get custody of that child. At that point in time, they had been - - the child was out of the home, but up until the point in time that the child was removed from the home, he and the mother had shared custody. He indicates that he wanted to have custody of their child. And then that's the background under which all this is happening.

So, again, pursuant to Delbridge, I believe that we've made our initial threshold, I'd submit to the Court that we made our initial threshold with respect to our burden, that the circumstances surrounding the disclosure lend themselves to the potential for taint. And I'd certainly submit to the Court that we intent to prove by clear and convincing evidence that that was the case.

(N.T., Pre-Trial Motions, 7/9/21, pp. 12 – 14). This Court denied the request, having found that the defense had not met the necessary threshold under Delbridge and that there would not be a taint hearing. Id. at 15.

40

Generally, a court evaluates an allegation of taint at a competency hearing. Commonwealth v. Delbridge, 855 A.2d 27, 40 (Pa. 2003). The proponent of the claim first bears the burden of establishing "some evidence" of taint. Id. Once the party meets that threshold requirement, he then must meet the ultimate burden of demonstrating taint by clear and convincing evidence. Id. The critical inquiry in deciding the issue of taint at a competency hearing is whether the memory of the child has been corrupted. Id.

In analyzing whether a party has met the "some evidence of taint" standard, the trial court considers the totality of the circumstances around the child's allegations. Id. at 41. The Pennsylvania Superior Court has identified some of the common considerations relevant to this analysis as follows:

> (1) the age of the child; (2) the existence of a motive hostile to the defendant on the part of the child's primary custodian; (3) the possibility that the child's primary custodian is unusually likely to read abuse into normal interaction; (4) whether the child was subjected to repeated interviews by various adults in positions of authority; (5) whether an interested adult was present during the course of any interviews; and (6) the existence of independent evidence regarding the interview techniques employed.

Commonwealth v. Judd, 897 A.2d 1224, 1229 (Pa.Super. 2006) (citation omitted).

In this case, the defense did not present "some evidence of taint" to warrant a taint hearing. D.B. was nine years old at the time of the disclosure in February of 2019. He was living with his maternal grandparents at that time. The disclosure occurred after Tina Wright, a Pennsylvania Department of

41

Human Service employee, had come into the home of D.B.'s grandparents. His mother was visiting him there on February 8, 2019, when Ms. Wright came to the home. In her conversation with Ms. Bunrout, she encouraged her to believe her son. That prompted Ms. Bunrout to talk to D.B, at which time he disclosed that Appellant had choked him.

In addition, defense counsel argued that the disclosure occurred after being interviewed by Mission Kids in September of 2018, and failing to make the allegation at that time. This in and of itself does not show some evidence of taint. D.B. was still living in the home with Appellant at that time of the September, 2018 interview. He was never interviewed again until February of 2019, after he did disclose to his mother and he was no longer living with Appellant. Further, defense counsel stated that Appellant wanted sole custody of the child he shared with Ms. Bunrout. However, this fact standing alone does not support a hostile motive on Ms. Bunrout's part.

Given the totality of the circumstances, defense counsel did not satisfy the burden to trigger a taint hearing.

IV.    Tender Years Exception

Fourth, Appellant claims it was trial curt error to admitted child hearsay pursuant to the Tender Years exception.

On January 9, 2020 and on March 10, 2020, the Commonwealth filed a Motion to Admit Out of Court Statements Pursuant to the Tender Years Act and a Supplemental Motion to Admit Out of Court Statements Pursuant to Tender Years Act, respectively. Therein, the Commonwealth sought to

42

introduce the statements made by D.B. to his mother on February 8, 2019 and those he made on February 9, 2019, to Maggie Sweeney in a forensic interview.

"[Q]uestions concerning the admissibility of evidence lie within the sound discretion of the trial court, and [a reviewing court] will not reverse the court's decision on such a question absent a clear abuse of discretion." Commonwealth v. Hunzer, 868 A.2d 498, 510 (Pa.Super. 2005) (citation omitted). Our appellate court applies the "abuse of discretion" standard when reviewing admission of statements under the tender years exception. Commonwealth v. Curley, 910 A.2d 692, 697 (Pa. Super. 2006).

"Generally, an out-of-court statement is inadmissible at trial unless it falls into one of the exceptions to the hearsay rule." Hunzer, supra. See also Pa.R.E. 801(c)(1) (defining "hearsay" as statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"), 803 ("Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute."). Tender Years Hearsay Act creates an exception to the hearsay rule for young victims and witnesses. The tender years exception provides for the admissibility of a hearsay statement when it has sufficient indicia of reliability as determined from the time, content, and circumstances of its making. Commonwealth v. O'Drain, 829 A.2d 316, 320 (Pa.Super. 2003) (citation omitted).

Pennsylvania's Tender Years Hearsay statute relevantly provides the following:

§ 5985.1. Admissibility of certain statements

43

(a) General rule.--

(1) An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated..., not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(i) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(ii) the child either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(1)(i)-(ii)(A)-(B) (bold in original).

Commonwealth v. Jones, 245 A.3d 1092 (Pa.Super. 2020). Our Supreme Court

explained:

The [Tender Years Act] concerns the admissibility of out-of-court statements made by a child victim or witness to third parties. The admissibility of this type of hearsay is determined by assessing the particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who is testifying. To determine whether a child's out-of-court statements are admissible under the [Tender Years Act], a trial court must assess the relevancy of the statements and their reliability in accordance with the test enunciated in Idaho v. Wright, [497 U.S. 805 (1990)]. Although the test is not exclusive, the most obvious factors to be considered include the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age and the lack of a motive to fabricate.

Commonwealth v. Walter, 93 A.3d 442, 451 (Pa. 2014) (quotations omitted).

At the July 9, 2021, Pre-Trial Motions Hearing this Court heard the

testimony of Ms. Bunrout and that of Maggie Sweeney. After which this Court

44

made the following findings of fact. On February 8, 2019, Ms. Bunrout was at her parents' house to see her kids. (N.T., Pre-Trial Motions, 7/9/21, p. 26). Appellant was not permitted to see the kids at that time. Id. at 24 – 25. D.B. was ten years old at that time. D.B. viewed Appellant as his father. Id. at 25.

While at her parents' house, Ms. Bunrout received a call from Tina Wright. Id. at 27. Ms. Wright came to the house. Id. at 27, 28. Her appearance was unexpected, and not a planned event on Ms. Bunrout's part. Id. at 27. Once there, they sat down and talked about why Ms. Wright was there. Id. at 27, 28. During the time they were talking, D.B. was up in his bedroom. Id. at 28. Ms. Bunrout testified that she had been crying downstairs when Ms. Wright was there. Id. at 42. After Ms. Wright left, Ms. Bunrout went upstairs and approached D.B. in his bedroom. Id. at 29, 30. Ms. Bunrout was not crying when she went upstairs to talk to D.B. Id. at 42. Her interaction with her son was very brief. Id. at 30 – 31. Ms. Bunrout said to D.B., "I just wanted to talk and basically said if he was telling somebody anything, like I would like to know." Id. at 30. At that point, D.B. broke down, and told her. Id. This statement was inconsistent with his prior statement to his mother, in which he denied any wrongdoing. Id. at 23. And his disclosure was inconsistent with his prior Mission Kids statement which did not lead to any kind of disclosure. Id. at 59.

Maggie Sweeney, who was the forensic interviewer at Mission Kids during the time of February of 2019. Id. at 48. She was a very experienced forensic interviewer. Id. at 48 – 49, 50 – 53. Mission Kids is a carefully

45

designed program so that the child is not subject to multiple interviews. Id. at 49. Forensic interviewers are trained in a protocol and to ask open-ended, non-leading questions in a child friendly manner and developmentally appropriate for each child. Id. at 50. The process at Mission Kids is carefully designed to generate truthful and accurate answers and not the product of guessing. Id. at 55. The interview is a situation where it is just the interviewer and the child in the interview room. Id. at 54. There are no interested adults or parents present. Id.

Following the testimony of Ms. Sweeney, the Commonwealth presented the in camera testimony of D.B.

Based upon these findings of fact, this Court made conclusions of law. Initially, this Court found that both the mother and Ms. Sweeney testified truthfully and accurately, and that their testimony was credible and worthy of belief. Id. at 98. The February of 2019 statements given to the mother and to Ms. Sweeney are consistent, but were inconsistent with D.B.'s prior statements in 2018 to his mother and to Mission Kids.

At the time of the 2019 statements, D.B. was not living with Appellant, who D.B. viewed as a parent. This Court found that D.B. had no motive to lie, and was particularly likely to be telling the truth when he made the statement to his mother and to Ms. Sweeney. This Court credited Ms. Bunrout's testimony as accurate in how she described her conversation with D.B., D.B.'s disclosure to his mother was spontaneous after a brief interaction. Ms. Bunrout did not ask questions in a detailed way, and only followed up with

46

a few very general follow-up questions. She did not pressure D.B. It was a situation in which this conversation with his mother was the spark that led to the truth. This Court concluded that the indications of reliability are present in D.B.'s statement to her. D.B.'s emotional and mental state was far different when he disclosed than at times when he was hiding the truth in the past. Further, as to the Mission Kids statement, this Court concluded that based upon the process that was used by Ms. Sweeney, it was reliable. Accordingly, this Court concluded that the Mission Kids statement and D.B.'s statement to his mother were admissible.

In this case, there is no dispute that D.B. was 10 years old when he made the statements to his mother and Ms. Sweeney in February of 2019, that the charged crimes were enumerated under the Tender Years Act, D.B. testified at trial, and that D.B.'s statements were relevant. Rather, defense counsel argued that his statement to his mother were not spontaneous. (N.T, Pre-Trial Motion, 7/9/21, p. 90). That the statements lacked consistency to those D.B. previously gave in 2018. Id. He further argued that D.B.'s mental state was not stable because he saw that his mother was upset prior to his disclosure, and that Ms. Bunrout immediately took D.B. to the police after he disclosed. Id. at 90 – 91. Defense counsel argued that although there is consistency between the February 2019 statements, these were both the product of D.B.'s excited mental state and that once he made the disclosure, he stuck with it whether it was true or not true. Therefore, the inconsistence of these statements with those of 2018 demonstrate a lack of reliability. Id. at 91.

47

However, this defense argument is not consistent with the determinations made by this Court after listening to the credible testimony of Ms. Bunrout, Ms. Sweeney, and D.B.'s in-camera testimony. On February 8, 2019, Ms. Bunrout unexpectedly had a conversation with Ms. Wright and then went up to D.B.'s bedroom and asked him very general questions, to which D.B. made the admission that Appellant had choked him. This was not planned, but rather sparked by his mom's questions. The next day when he spoke to Ms. Sweeney, D.B. was consistent in the allegations he made against Appellant. The fact that the February 8, 2019 disclosure to his mom which was consistent with D.B.'s statement to Ms. Sweeney on February 9, 2019, were inconsistent with previous Mission Kids statements is understandable. In 2019, D.B. was no longer living with Appellant, as compared to 2018 when he was. Further, D.B. had no motive to fabricate an allegation of abuse against Appellant, the man who he thought of as his father. Therefore, the statements D.B. made to his mother and the Mission Kids February 9, 2019 statement were admissible under the Tender Years Act. The content and circumstances of D.B.'s statements provide a sufficient indicia of reliability. Moreover, this Court provided the jury with a cautionary instruction. (N.T., Trial by Jury, 10/26/21 p. 131 – 132).

V.    Mistrial

Fifth, Appellant contends that this Court erred in denying his motion for a mistrial for a discovery violation where the child complaining witness disclosed additional facts to the Commonwealth during trial

48

preparations and the Commonwealth failed to disclose this new information to him prior to that witness's testimony.

On the second day of trial, the Commonwealth presented the testimony of D.B. In relevant, the Commonwealth questioned D.B. about what Appellant would do to hurt him. (N.T., Trial by Jury, 10/26/21, p. 25). D.B. explained that Appellant would put his arm around his neck, and D.B. demonstrated a chokehold position. Id. D.B. described that it would hurt and that he couldn't breathe. Id. D.B. explained that Appellant would have him in this position, "[f]or a while" and that he "would pass out." Id. at 26. On cross-examination, defense counsel questioned D.B. about his statement that he would pass out. Id. at 53. Defense counsel asked D.B. whether he had ever told Ms. Sweeney from Mission Kids that he had passed out. Id. at 53 – 54. Defense counsel further asked whether today at trial was the first time he was ever telling anybody about passing out. Id. at 54. In particular he asked whether D.B. had ever told anyone in the District Attorney's Office that he had passed out before trial. Id. D.B. responded that he had. Id. At this juncture, defense counsel requested a sidebar. Id. After the jury left the courtroom, defense counsel made a motion for a mistrial. Id. at 55. He argued as follows:

> This is the first I'm hearing about in terms of passing out as a result of this. Obviously, strangulation has been consistent – starting in February of 2019, but has been consistent, but this is the first time I'm hearing about this. It didn't come up in the Mission Kids interviews. And I understand things come up over the course of prepping witnesses, obviously having sat where Ms. Ringwood and Mr. McCann are. Sometimes things come up that didn't come up in discovery

49

before. I just never received anything with respect to that point. So, accordingly, I'd just move for a mistrial.

Id. In response, the Commonwealth explained that D.B. flew in on Thursday, and that she met with him on Friday and also on Sunday. Id. It was on Friday that D.B. did disclose as part of the prepping him for trial that he did say that he passed out. Id. at 56. While the Commonwealth acknowledged that prior to prepping him for trial, D.B. never specifically said the words "passed out," it argued that it is fair to infer from the totality of the details of his disclosure that this happened. Id. The Commonwealth further argued that it is a minor detail in context of D.B.'s entire testimony. Id.

Defense counsel responded that Appellant has been prejudiced by this discovery failure because his cross-examination of the Commonwealth's expert Dr. Christian was impacted by limiting his full and fair opportunity to do so. Id. at 58. The Commonwealth observed that during Dr. Christian's direct testimony she never discussed passing out, and there were never any questions about passing out. Id.

It is well settled that "[a] mistrial is an 'extreme remedy' that is only required where the challenged event deprived the accused of a fair and impartial trial. The denial of a mistrial motion is reviewed for an abuse of discretion." Commonwealth v. Laird, 988 A.2d 618, 638 (Pa. 2010) (citations omitted); see also Commonwealth v. Bozic, 997 A.2d 1211, 1226 (Pa.Super. 2010) (in the context of reviewing the denial of a mistrial motion, stating that "the court abuses its discretion if, in resolving the issue for decision, it

50

misapplies the law or exercises its discretion in a manner lacking reason." (citation omitted)). "The trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, assess the degree of any resulting prejudice." Bozic, 997 A.2d at 1225 (citation and ellipses omitted).

A violation of discovery does not automatically entitle [the defendant] to a new trial. Rather, a defendant must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure. Commonwealth v. Brown, 200 A.3d 986, 993 (Pa.Super. 2018) (some citations omitted and formatting altered); see also Commonwealth v. Ligons, 773 A.2d 1231, 1237 (Pa. 2001) (stating that "the trial court is accorded broad discretion in fashioning a remedy [for a Commonwealth discovery violation], with a mistrial warranted only when the violation is of such nature as to deprive the defendant of a fair trial" (citation omitted)).

This Court denied the motion for a mistrial, finding there was no manifest necessity for a mistrial. (N.T., Trial by Jury, 10/26/21, p. 59). This Court rejected the defense argument that cross-examination of Dr. Christian was impacted, in that knowledge of "passing out" would have materially affected cross-examination. Id. This Court observed that Dr. Christian was questioned at length about the mechanics of strangulation and the impact on

51

the larynx, throat, the cutting off the air supply by eliminating the oxygen or otherwise depriving the brain of blood. Id. at 59 – 60. Further, this Court found that the testimony of passing out was within the context of what was being described all along in the materials previously provided to the defense. Id. at 60. There was no part of the Commonwealth to hide something or not reveal something that seemed to be within what has been spoken about all along. Id. Therefore, the motion for a mistrial was properly denied.

## VI.    Continuance Request

Sixth, Appellant asserts that it was an error of the trial court in denying his request for a continuance where a pediatric pathologist became unavailable to testify.

On Thursday, October 21, 2021, an additional pre-trial motions hearing was held, in part to address the motion for a continuance that defense counsel had filed the previous day. (N.T, Pre-Trial Motions, 10/21/21, p. 2). The basis for his request was that expert witness, Dr. Laura Waters, a pediatric pathologist, had become unavailable, and that she no longer had an interest in participating in this case. Id. at 4, 6. Defense counsel wanted extra time to try to find another defense expert. Id. at 9.

Our appellate court will review the denial of a continuance for an abuse of discretion. See Commonwealth v. Broitman, 217 A.3d 297, 299 (Pa.Super. 2019). "This Court will not find an abuse of discretion if the denial of the continuance request did not prejudice the appellant." Id. An appellant

52

shows prejudice where he is " 'able to show specifically in what manner he was unable to prepare his defense or how he would have prepared differently had he been given more time.' " Id. at 300 (citing Commonwealth v. Ross, 57 A.3d 85, 91 (Pa.Super. 2012)).

[W]hen reviewing a trial court's decision to deny a request for a continuance, the following factors will be considered:

> (1) the necessity of the witness to strengthen the defendant's case;
> (2) the essentiality of the witness to the defendant's defense;
> (3) the diligence exercised to procure his or her presence at trial;
> (4) the facts to which he or she could testify; and
> (5) the likelihood that he or she could be produced at court if a continuance were granted.

Commonwealth v. Small, 559 Pa. 423, 453, 741 A.2d 666, 683 (1999) (citations omitted).

At the hearing, defense counsel elaborated and explained that at the time of K.B.'s death her autopsy was performed by deputy coroner with Montgomery County Coroner's Officer, Dr. Marianne Hamel. (N.T, Pre-Trial Motions, 10/21/21, p. 2). In her autopsy report, Dr. Hamel opined that the cause of manner of death were undetermined. Id. at 2 – 3. An investigation into K.B.'s death was re-opened in 2018 as a result of the investigation into D.B.'s injuries. Id. at 3. Appellant was arrested in February of 2019. Id. Subsequently, the Montgomery County District Attorney's Office retained to Dr. Gulino, the chief medical examiner in the city of Philadelphia. Id. at 4. He issued a report

53

that K.B. died of blunt force trauma and strangulation, and that the manner of death was homicide. Id. Based upon this information the Montgomery County Coroner's Officer sent their materials to Dr. Waters. Id. Dr. Waters issued an opinion in January of 2020, which stated that the cause and manner of K.B.'s death were best left as undetermined. Id. That report was turned over to the District Attorney's Office in July of 2020, and a few days later the District Attorney's Office provided it to the defense. Id.

Prior to the scheduling of trial, which was in April of 2021, defense counsel spoke with Dr. Waters, who indicated she would be willing and available to testify at trial. Id. at 5. A few weeks prior to the hearing, defense counsel spoke with Dr. Waters, who indicated that due to undisclosed health reasons she was no longer available, and would also not be able to testify via a live video link. Id. at 5 – 6. Dr. Waters ultimately told defense counsel that she no longer wanted to participate in this case. Id. at 6.

Defense counsel argued that due to the nature of the allegations in this case, and that pediatric pathology is a specialized field, he would need additional time to try and find an expert who might be able to render an opinion in support of his defense. Id.

In pertinent part, the Commonwealth told this Court that it would be prejudiced if the case was continued. It was ready to proceed the following Monday with all of its witnesses. Id. at 7 – 8. In particular, its two expert witnesses. Id. at 8. One expert had to fly here from overseas. Id. Multiple witnesses were flying in from out of state and were arriving that day. Id.

54

Further, the Commonwealth highlighted for the Court that defense counsel has not identified a specific expert he would retain, and that he might even find an expert to support the defense. Id. Further, the deputy coroner Dr. Hamel who performed the autopsy will be testifying at trial. Id. at 9.

After outlining their respective positions, this Court denied the request and placed its reasons on the record as follows:

> I deny the request for a continuance based in a large part on the fact that the defense has, as a witness, the person who performed the autopsy. The person who performed the autopsy is in the best position to make a call on manner and cause of death. I don't think there'll ever be a forensic pathologist that would disagree with that statement. I've heard that testimony under oath before.
>
> There also is a great deal of speculation here. To continue this case a great prejudice to the Commonwealth and end up having another date in the future without the defense coming up with any additional witnesses I think is the likely result.
>
> So I think the defendant can present his defense and we'll have the trial starting Monday.

Id. at 10 – 11.

In this case, this Court noted that the necessity of the witness was not paramount to the defendant's case. He already had the forensic pathologist who actually performed the autopsy available to testify. It was her autopsy findings that was the foundation for the defense assertion that K.B.'s death was not a homicide and that the injuries found on her body were merely the result of resuscitation efforts. In addition, it was pure speculation that the defense would be able to procure another pediatric pathologist who would

55

support the defense position. Further, to continue the case would prejudice the Commonwealth who had arranged for all of its witnesses to be present on the scheduled trial dates. Accordingly, the request for a continuance request was properly denied.

VII.    Autopsy Photographs

Appellant's next issue on appeal, he claims that this Court erred in admitting autopsy photographs for K.B., the four-year-old decedent.

Appellant filed a Motion in Limine to Exclude Autopsy Photographs on March 12, 2020. Defense counsel objected at the Pre-Trial Motions Hearing held on May 12, 2021, to the those photographs of K.B., a four-year-old child, which depict her entire body laid out on the autopsy table with injuries, artifacts of resuscitation and dried blood around her nose. (N.T., Pre-Trial Motions, 5/12/21, pp. 5- 6). He argued that the jury would not be able to separate out the depiction of her injuries combined from the artifacts of resuscitation, and that these photographs were inflammatory per se. Id. at 7. He also argued that the need for these photographs does not outweigh the likelihood of inflaming the jury's passions. Id. 7 – 8. More specifically, defense counsel argued that the Commonwealth's expert, Dr. Gulino, who authored a report, sets forth his findings as to what he observed after examining these photographs and therefore, the need to show them to the jury is not necessarily that great. Id. at 8 – 9. In the alternative, defense counsel suggested that should this Court determined that these photographs are admissible, then they

56

should be introduced in black and white and that the artifacts of resuscitation be redacted. Id. at 10 - 11.

The Commonwealth did submit that it could redact some portions of the objected to photographs such as the nose, intubation, and the child's genitalia. Id. at 11 – 12. As to the defense argument as to necessity overall of the photographs, the Commonwealth argued that in a case such as this photographs are very necessary. Id. at 12. The Commonwealth pointed out that the defense strategy is to allege is that K.B.'s death is not even a homicide, and will introduce the findings of the Montgomery County Coroner's Office who ruled K.B.'s death as undetermined. Id. Therefore, the Commonwealth will have to show not this is a homicide and in fact first-degree murder. Id. To that end, it is necessary to show that there was bruising on K.B.'s chest and that there were injuries that were not caused by resuscitation as was suggested by the Montgomery County Coroner's Office. Id. at 12 – 13. In addition, the Commonwealth rejected the idea of presenting the photographs in black and white because the color photographs show the bruising and hemorrhages in the eyes. Id. at 13. The Commonwealth explained that it is necessary to show this to the jury in color to prove that these were inflicted injuries and not caused by resuscitation. Id.

This Court denied the Motion in Limine on May 21, 2021.

The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error. Commonwealth v. McCutchen, 454 A.2d 547,

57

549 (Pa. 1982). In this regard, the Pennsylvania Supreme Court has observed that:

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

Commonwealth v. Tharp, 830 A.2d 519, 531 (Pa. 2003). When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:

> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

Id. (citation omitted). Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs. Commonwealth v. Jacobs, 639 A.2d 786, 789 (Pa. 1994).

58

In this case, this Court determined that admission of these photographs was proper. They were absolutely necessary to establish the cause and manner of death, both of which were at issue in this case. In fact, there were competing expert opinions on these issues at trial. Additionally, these photographs were needed by the Commonwealth's forensic pathologist to explain his opinion. This Court found that the probative value far outweighs the prejudicial impact in this case. In addition, this Court limited the amount of time in which they would be displayed in seconds, not minutes. And the forensic pathologist will be oriented to the photographs before they are displayed to the jury. Further, this Court provided a cautionary instruction[3] to the jury several times. (N.T., Trial by Jury, 10/25/21, p. 11 – 12, 46, 61; N.T., Trial by Jury, 10/27/21, p. 9).

The Pennsylvania Supreme Court case of Commonwealth v. Woodward, 129 A.3d 480 (Pa. 2015) is instructive to our case. The trial court in Woodward entered an order granting the Commonwealth's motion in limine permitting in part the admission of 12 color autopsy photographs of the 2-year-old victim. The trial court determined that the Commonwealth satisfied its

---

[3]     This Court cautioned the jury as follows:

> Members of the jury, once again, I remind you it won't be a pleasant photograph to look at. It won't be up too long, but you should not let it stir up your emotions to the prejudice of the defendant. Your verdict must be based on a rational and fair consideration of all the evidence and not on passion or prejudice against the defendant, the Commonwealth, or anyone else connected with this case.

(N.T., Trial by Jury, 10/25/21, pp. 61 – 62).

59

burden of demonstrating that the photos were necessary to rebut the defense of an accidental drowning. On appeal to the Pennsylvania Supreme Court the appellant argued, inter alia, that the trial court had abused its discretion in permitting the Commonwealth to admit these photos into evidence. The Court held that the trial court acted within its discretion, and concluded that the images depicted were not inflammatory. The Court reasoned that "the twelve challenged color photographs portrayed various parts of [the boy's] body and illustrated the nature and extent of his injuries, which would have not been readily detectable in a black and white photo." Woodard, 129 A.3d at 494-95. The jury in Woodard was not given the photographs to examine during deliberations, but viewed them in connection with the Commonwealth's expert's testimony explaining the findings of the autopsy report. Id. at 495.

The Court in Woodard further noted that even if the photographs were inflammatory, "we conclude, without hesitation, that they were highly probative as they related directly to the requisite elements of first degree murder, i.e., that [the boy] was unlawfully killed, as opposed to having drowned by accident, and that [the a]ppellant possessed the specific intent to kill." Id.; see also, e.g., Commonwealth v. Gorby, 527 Pa. 98, 588 A.2d 902, 908 (1991) (no abuse of discretion in allowing photographs "which depicted a large gaping gash on the victim's neck as well as thirteen other knife wounds located on the victim's hands, arms, back, and chest" to establish intent to kill); Commonwealth v. Chester, 526 Pa. 578, 587 A.2d 1367, 1374 (1991) (holding that a color photograph of gaping neck wound of murder victim was

60

inflammatory, but was essential evidence of specific intent to kill when the defendants claimed that they unintentionally caused the victim's death.).

Finally, this Court provided the jury with a cautionary instruction three times during the course of the trial. Commonwealth v. O'Hannon, 732 A.2d 1193, 1196 (Pa. 1999) ("Absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions.").

VIII.  Voir Dire Questions

Finally, Appellant alleges that this Court erred in declining to read the proposed voir dire questions to the jury panel regarding the nature of the offenses and the autopsy photographs of the four-year-old decedent to determine if potential jurors could set aside their passions and determine the matter based on the evidence presented.

In assessing Appellant's claim, the following standard of review in applied upon appellate review.

> The scope of voir dire rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. The purpose of voir dire is to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury. The scope of voir dire should therefore be limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence. A prospective juror's personal views are of no moment absent a showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court.

61

Commonwealth v. Karenbauer, 715 A.2d 1086, 1094 (Pa. 1998) (internal citations and quotation marks omitted).

The purpose of the *voir dire* examination is to provide an opportunity to counsel to assess the qualifications of prospective jurors to serve. Commonwealth v. Johnson, 305 A.2d 5 (Pa. 1973). It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification. Id. Thus the inquiry must be directed at ascertaining whether the venireperson is competent and capable of rendering a fair, impartial and unbiased verdict. Id. The law also recognizes that prospective jurors were not cultivated in hermetically sealed environments free of all beliefs, conceptions and views. The question relevant to a determination of qualification is whether any biases or prejudices can be put aside upon the proper instruction of the court. Commonwealth v. England, 375 A.2d 1292 (Pa. 1977).

> As we recognized above, the purpose of the voir dire examination is to disclose qualifications or lack of qualifications of a juror and in particular to determine whether a juror has formed a fixed opinion as to the accused's guilt or innocence. The law recognizes that it would be unrealistic to expect jurors to be free from all prejudices, a failing common to all human beings. We can only attempt to have them put aside those prejudices in the performance of their duty, the determination of guilt or innocence. We therefore do not expect a tabula rosa [sic] but merely a mind sufficiently conscious of its sworn responsibility and willing to attempt to reach a decision solely on the facts presented, assiduously avoiding the influences of irrelevant factors.

Johnson, 305 A.2d at 8.

It is equally well established that *voir dire* is not to be used to attempt to ascertain a prospective juror's present impressions or attitudes.

> The examination of jurors under *voir dire* is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury.... Neither counsel for the defendant nor for the Commonwealth should be permitted to ... ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case. While considerable latitude should be permitted on a *voir dire*, the inquiry should be strictly confined to disclosing qualifications of a juror and whether a juror has formed a fixed opinion or may be otherwise subject to disqualifications for cause."

Commonwealth v. McGrew, 100 A.2d 467, 470 (Pa. 1953); See, Commonwealth v. Biebighauser, 300 A.2d 70, 75 (Pa. 1973); Commonwealth v. Hoss, 283 A.2d 58, 63, 64 (Pa. 1971); Commonwealth v. Swanson, 248 A.2d 12, 15 (Pa. 1968).

With these principles in mind, we turn the case at issue. On the first day of trial, defense counsel placed on the record that he proposed a voir dire question with respect to the autopsy photographs, which the Court declined. (N.T., Trial by Jury, 10/25/21, p. 48). Defense counsel stated that in his experience that when you have autopsy photographs of a child, inevitably a few jurors get extremely upset. Id. After the Commonwealth stated its response, this Court put on the record the reason for its denial of the request. Defense counsel's proposed question does not relate to whether the prospective juror could render a fair and impartial verdict based upon the evidence presented at trial. Rather, the proposed question seeks to elicit "what a juror's present

63

impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case." Id. at 49. Therefore, the rejected question was irrelevant to the legitimate purposes of voir dire and properly disallowed by this Court. In addition, this Court did provide cautionary instructions to the jury, several times, in this regard.

CONCLUSION

Based upon the foregoing analysis, Appellant's judgment of sentence entered on October 28, 2021, should be affirmed.

**BY THE COURT:**

_WlDa R. Cp_

_____

**WILLIAM R. CARPENTER      J.**
**COURT OF COMMON PLEAS**
**MONTGOMERY COUNTY**
**PENNSYLVANIA**
**38TH JUDICIAL DISTRICT**

**Copies sent on February 16, 2022**
**By Electronic Mail to:**

Robert Falin, Esquire, Deputy District Attorney, Chief of Appellate Division; RFalin@montcopa.org

Matthew W. Quigg, Esquire; MQuigg@rgsglaw.com

Denise S. Vicario, Esquire, Executive Director; opinions@montgomerybar.org

Paul DAnnunzio; PDAnnunzio@alm.com

**Copies sent on February 16, 2022
By First Class Mail to:**

Marquis Lamont Thomas #QN6794
SCI Smithfield
1120 Pike Street
Huntingdon, PA 16652

*Christina M Baylla*
_____
Judicial Assistant

65